**NEW YORK CITY UNEMPLOYED AND WELFARE COUNCIL, Alma Brooks, James Scott, and Phyllis Bolding, Plaintiffs-Appellants,**

v.

**Stanley BREZENOFF, as Administrator/Commissioner of the New York City Human Resources Administration and Commissioner of New York City Department of Social Services, et al., Defendants-Appellees.**

**No. 346, Docket 81–7255.**

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1981.

Decided April 20, 1982.

Cathy Hollenberg, New York City (Harry Kresky, Kresky, Sinawski & Hollenberg, New York City, on the brief), for plaintiffs-appellants.

Carolyn E. Demarest, New York City (Allen G. Schwartz, Corp. Counsel for the City of New York, Dana Robbins, Law Clerk, New York City, on the brief), for defendants-appellees.

Before TIMBERS and KEARSE, Circuit Judges, and MURPHY, District Judge.[*]

KEARSE, Circuit Judge:

Plaintiffs-appellants, the New York City Unemployed and Welfare Council (the "Council") and three of its members, appeal from so much of a judgment of the United States District Court for the Southern District of New York, Richard Owen, Judge, entered after a bench trial, as denied relief on plaintiffs' claims, brought under 42 U.S.C. § 1983 (Supp. III 1979), that regulations issued by defendants-appellees, officials of the New York City Human Resources Administration ("HRA"), an agency that administers the City's welfare program, violated plaintiffs' rights under the First and Fourteenth Amendments to the Constitution. Plaintiffs challenged HRA regulations that restricted the rights of organizations to converse with, distribute leaflets to, and collect contributions from welfare recipients and applicants on the premise of the City's Income Maintenance Centers ("IMCs"). In an oral opinion, the district court ordered a modification of an HRA regulation confining all organization representatives within the IMCs to a table, and in all other respects denied plaintiffs' requests for relief. For the reasons below, we affirm in large part, but we vacate and remand for further consideration so much of the judgment as upheld the HRA's complete ban on solicitation of contributions inside the IMCs.

## BACKGROUND

The Council is an association composed of welfare recipients.[1] It has between 8,000 and 10,900 members, most of whom pay membership dues of $1 per year, although some pay no dues. The Council has five offices, one in each of New York City's five boroughs, which are operated and staffed principally by its members on a volunteer basis. The Council's income from dues and donations is used to pay the operating expenses of Council offices.

The purposes of the Council are, generally, to organize welfare recipients, to educate them as to their legal rights, to improve conditions at the IMCs, and to eliminate poverty. In addition to pursuing these broad goals, the Council also endeavors to assist individual members in obtaining welfare benefits. In pursuing these objectives and in seeking to increase its membership, the Council has used methods such as distributing leaflets, conversing with members and prospective members, holding demonstrations, acting as advocate for individual members, and soliciting contributions or membership fees.

The principal focal points of the Council's activities are the forty-odd IMCs, located in various sections of New York City and administered by the HRA. Welfare recipients and applicants (collectively referred to as "clients") go to these centers to, *inter alia*, receive welfare checks and food stamps, obtain information about eligibility requirements, and receive assistance with their applications and with their personal and financial problems. In a typical IMC,[2] welfare clients first enter a reception area containing a waiting room, where, after waiting for some period of time, they receive instructions as to where to proceed to pursue whatever items or services they have come to the center to obtain. They go next to another area, ordinarily located on an upper floor. This area is typically composed of two sections, separated by a partition; on one side, the IMC staff works and interviews clients; on the other, clients wait further to meet with the staff.

---

[*] Honorable Thomas F. Murphy, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

[1] In its oral opinion, the district court made no formal findings with regard to a number of factual matters, such as the organization and operations of the Council. The description in the text is culled largely from the evidence at trial, and does not appear to be, at this stage, the subject of dispute.

[2] Although the details of the interior design of each IMC may vary, most share the same general layout, and at most IMCs a welfare recipient follows the same steps once inside the center.

In pertinent part the challenged HRA regulations, issued on March 15, 1977, provide as follows:

■ Organizations desiring to converse with clients and distribute literature will be stationed at the Community Client-Advisary's [sic] distribution table located in a designated waiting area at each Income Maintenance Center.

■ No more than two (2) representatives from a particular organization will be permitted at the distribution table.

■ The Agency's Office of Community Affairs (Mr. Burt Chevers, Supervisor of Bronx Unit, 553–6072 or 5918) will schedule and control the use of the table to insure that all organizations desiring to distribute literature will have equal access in the center. Use of the table will depend on the demand from the various organizations.

■ Organizations will not be permitted to solicite [sic] membership fees or contributions from public assistance recipients in the center.[3]

As regulation [1] has been interpreted, the "designated waiting area" is normally the IMC's first-floor waiting room, with organizations barred from proceeding to any second-floor waiting area. Regulation [3] is construed to require only one day's advance notice of an organization's desire for access to an IMC.

In October 1980, plaintiffs commenced the present action, contending that the regulations are overbroad and thus impermissibly restrict plaintiffs' rights under the First Amendment. At the close of a three-day bench trial, the district court found that insofar as regulations [1]–[4] restrict the activities of organizations to the first-floor reception areas, require that notice of a desire to use the IMC tables be given one day in advance, and ban the solicitation of membership fees or contributions from clients inside the centers, they are "reasonable," and "legitimately promulgated to meet a need." As to so much of regulation [1] as required that all representatives of organizations remain stationed at the table, however, the court ruled that the regulation was unduly restrictive. It therefore ordered that that regulation be modified to allow at least one representative of each organization to move freely about the first-floor reception rooms in order to communicate with clients waiting there.[4]

■ Plaintiffs appeal from the district court's judgment insofar as it upheld the regulations;[5] defendants have not cross-ap-

---

**3.** In addition, a fifth regulation provides that "[o]rganizations may not utilize children of public assistance recipients to distribute leaflets or materials in the center." Although plaintiffs attack this regulation on appeal, at trial they stated that the Council did not use children and that they therefore did not contest this regulation. Regulation [5] was thus not addressed by the district court and we will entertain no challenge to it here.

**4.** The court stated that the regulations should provide that

at least one member of the plaintiff's or any other organization should be permitted to move freely about that first reception room and speak with people who are sitting around waiting and may do so as long as the person to whom they are speaking is obviously a willing listener and not an unwilling listener, and that such circulating by the plaintiff's representative is permissible as long as it doesn't interfere with or disrupt the business that is being carried on in that waiting room. Slip op. at 4. Defendants correctly interpret this modification to require that the circulating

representatives be allowed not only to converse with welfare clients but also to distribute printed material to them. (Appellees' Brief at 12–13.) It is established that "the activity of peaceful pamphleteering is a form of communication protected by the First Amendment." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971); *see* cases cited therein. In *Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319, 1324 (2d Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974), we stated that the defendants could not deny "permission to speak and, peaceably and in a reasonable manner, to distribute leaflets" in a welfare center waiting room. We infer from the district court's reference to the latter case, in the course of requiring that regulation [1] be modified, that the court's modification was intended to require that the peaceful distribution of literature by the circulating representatives to willing recipients also be allowed.

**5.** Plaintiffs also complain that their rights have been violated by the HRA's establishment and support of Client Advisory Committees

pealed from the portion of the judgment that ordered modification of regulation [1]. We affirm the district court's decision except to the extent that it upheld HRA regulation [4], which bans all solicitation of contributions and membership fees. As to regulation [4], we vacate the judgment and remand for consideration of whether a less restrictive regulation would likely be adequate to achieve defendants' legitimate aims.

## DISCUSSION

 Freedom of expression, safeguarded by the First and Fourteenth Amendments to the Constitution, is a fundamental right, essential to our democratic society and accorded great weight by our courts. *See, e.g., De Jonge v. Oregon,* 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278 (1937); *NAACP v. Button,* 371 U.S. 415, 431, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963). Thus, government restrictions on the exercise of this right require careful scrutiny. Since one of the primary goals of the First Amendment is to "assure unfettered interchange of ideas," *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957), and to ensure "the widest possible dissemination of information from diverse and antagonistic sources," *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945), restrictions based on the content of communication are especially disfavored, *see, e.g., United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S.

("CACs"). CACs exist to provide the HRA with input from welfare clients and the community; membership is open to all, including the plaintiffs. Plaintiffs complain that the HRA gave the CACs privileges it did not make available to other groups, such as the use of telephones and duplicating machines at the IMCs, the inclusion of information about the CACs in HRA mailings, and the provision of coffee and car fare for those attending CAC meetings. In the district court, plaintiffs contended that the granting of these privileges violated plaintiffs' rights under both the Equal Protection Clause and the First Amendment. On appeal plaintiffs challenge the establishment and support of the CACs only as a violation of their First Amendment rights:

> the gravamen of plaintiffs' complaint is not that their right to equal treatment has been violated, but that the rights of all welfare recipients to freely associate and determine the form of representation they desire had been abridged.

(Appellants' Brief at 13.)

In aid of their argument, plaintiffs contend that the CACs are not autonomous organizations operating independently of the HRA, and we agree that the trial evidence supports this proposition. The City, with Columbia University, conceived the idea of CACs; it established them, enlisted people to serve on them, and edited their bylaws; the HRA participates in the CAC meetings, and the only CAC minutes brought to our attention suggest that the agenda for that CAC meeting was prepared by the HRA. Although the district judge's findings as to the nature of the CACs could have been clearer, we do not understand him to have rejected plaintiffs' view that the CACs are not autonomous. Despite the district court's use of the word "independent," it appears that the court viewed CACs as an unofficial arm of the HRA. This interpretation is supported by the judge's trial ruling early in the presentation of the plaintiffs' case that plaintiffs had established "that the CACs are a creature of" the HRA (Tr. at 46), and by his ultimate conclusion that the City "is entitled ... to have such an organization." Slip op. at 2.

We concur in the district court's ruling that the HRA's establishment and support of CACs do not abridge plaintiffs' rights. The district court found that the privileges accorded CACs to use IMC office facilities are likewise available to organizations such as the Council. This finding is not clearly erroneous. Further, plaintiffs have no First Amendment right to have the defendants include information about the Council in HRA mailings to welfare recipients. Envelopes traditionally are not considered public forums; nor has the HRA converted its welfare envelopes into public forums by the inclusion of information about the CACs, since the CACs are creatures of the City. And since the HRA envelopes have not been opened to mailings by *any* autonomous organization, it cannot be said that there has been any content-based discrimination in defendants' refusals to include communications from the plaintiffs. *See* Discussion in text, *infra.* In short, the defendants' refusal to include literature supplied by the Council simply does not, in the present circumstances, violate plaintiffs' First Amendment rights. *See, e.g., United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (dictum); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (dictum); *Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (dictum); *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 537–39, 100 S.Ct. 2326, 2333–34, 65 L.Ed.2d 319 (1980); *Police Department v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212 (1972), and have been upheld only in very limited circumstances, *see Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Moreover, when regulation of expression takes the form of prior restraint, it is presumptively unconstitutional, and the government, in seeking to justify it, bears a " 'heavy burden.' " *See Healy v. James*, 408 U.S. 169, 184, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1977) (quoting *Near v. Minnesota*, 283 U.S. 697, 713–16, 51 S.Ct. 625, 630–31, 75 L.Ed. 1357 (1931)).

█ Nonetheless, in protecting freedom of speech, the First Amendment does not prohibit all regulation of expressive activities; First Amendment rights may be governed by appropriate limitations on the time, place, and manner of their exercise. *See, e.g., Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Consolidated Edison v. Public Service Commission*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319 (2d Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). The validity of a particular time, place, and manner regulation depends on several factors. First, the regulation must be content-neutral. *See, e.g., Heffron v. International Society for Krishna Consciousness, Inc., supra; Consolidated Edison Co. v. Public Service Commission, supra; Police Department v. Mosley, supra.* In addition, the regulation must be closely related to a significant governmental interest, and must be the least restrictive means of serving that interest. *See, e.g., Heffron v. International Society for Krishna Consciousness, Inc., supra; Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Grayned v. City of Rockford, supra.* In

assessing the importance of the government's interest in regulation, the characteristics of the place and the particular expressive activities involved must be considered. Thus, for example, if the area sought to be regulated is one that has traditionally been considered a "public forum," such as a street or park, *see, e.g., United States Postal Service v. Council of Greenburgh Civic Associations, supra* (dictum); *Police Department v. Mosley, supra; Martin v. City of Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Schneider v. State, supra*, or, has become a public forum because it was designed to be used as an area where members of the public may exchange views or engage in expressive activities, *see, e.g., City of Madison Joint School District v. Wisconsin Employment Relations Commission*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (public meeting hall); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theatre used for performance of plays for the local public); *see also* L. Tribe, *American Constitutional Law*, § 12–21, at 690, then few restrictions on its use for the exercise of First Amendment freedoms will be tolerated. *See id.* If, however, an area is not a public forum, but is one used by the government to perform some non-speech-related function, it may nevertheless be "appropriate" for the exercise of First Amendment activities if that exercise does not interfere with the primary activity for which it is intended, *see e.g., Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (public school); *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (public library); *Albany Welfare Rights Organization v. Wyman, supra*, (welfare center); *Wolin v. Port of New York Authority*, 392 F.2d 83 (2d Cir.) (bus terminal), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968), and if that exercise does not infringe the rights of a captive audience, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); *see Tinker v. Des Moines Independent Community School Dis-*

*trict, supra,* 393 U.S. at 508, 513, 89 S.Ct. at 737, 740. *See also* Stone, *Fora Americana: Speech in Public Places,* 1974 Sup.Ct.Rev. 233, 252–55. Since the government in this situation has a significant interest in ensuring the normal functioning of the place, greater restrictions on the exercise of First Amendment rights are permitted. Finally, the availability of alternative forums must be considered. *Heffron v. International Society for Krishna Consciousness, Inc., supra; Albany Welfare Rights Organization v. Wyman, supra.*

The first floor waiting rooms of welfare centers, although not characterizable as traditional public forums, *see Albany Welfare Rights Organization v. Wyman, supra,* 493 F.2d at 1323; *but see Unemployed Workers Union v. Hackett,* 332 F.Supp. 1372, 1379 (D.R.I.1971) (office of Department of Employment Security held to be public forum), are nevertheless public places, open to all, and are therefore areas in which First Amendment rights with regard to welfare issues may not be banned. *Wolin v. Port of New York Authority, supra,* 392 F.2d at 90. However, expressive activities inside the centers may be restricted by reasonable time, place, and manner regulations, narrowly drawn and designed to ensure the proper functioning of the centers' primary activities. *Id.* at 85, 93; *Albany Welfare Rights Organization v. Wyman, supra,* 493 F.2d at 1323; *Unemployed Workers Union v. Hackett, supra,* 332 F.Supp. at 1377.

■ In the present case, we find no error in the district court's ruling that regulations [1], as amended, [2], and [3], which require advance scheduling of the use of IMC tables and limit plaintiffs' right to circulate freely, are valid time, place, and manner regulations. The evidence showed that all of the regulations are content-neutral. They apply not only to the Council but as well to other independent organizations and to the Client Advisory Committees set up by the HRA itself (*see* note 5, *supra*). All of the regulations are intended to protect a valid governmental interest— that of ensuring the orderly functioning of the IMCs. Given the space limitations of the IMCs, it appears that the restrictions on numbers of representatives of each organization who may be present and who may circulate among the welfare clients are directly related to that interest. The advance-notice requirement is similarly designed to avoid the presence of more organizations than can be accommodated in an orderly fashion. Finally, the evidence supports the conclusion that regulations [1], as modified, [2], and [3] are no more restrictive than necessary, in the circumstances, to serve the valid governmental interests. For example, the advance notice that is required may be given by telephone on the day before attendance is desired, and seems to be the least restrictive efficient method of coordinating the various organizations. Similarly, the restriction of organization representatives to the waiting room on the main floor also seems no more limiting than is needed to ensure that the actual working areas of IMC staff remain free of disruption. These working areas normally are located on the second floor and are separated from the smaller waiting areas located there only by partitions, some of which are no more than four feet high. The district court found that all welfare clients enter the main floor waiting room and have free time there before being sent upstairs to the smaller waiting areas. The findings are not clearly erroneous and the conclusion that these regulations are not unnecessarily restrictive is justifiable. We thus uphold the dismissal of plaintiffs' challenges to regulations [1], as modified, [2], and [3].

■ We are not so confident, however, of the correctness of the district court's approval of regulation [4], which imposes a complete ban on the solicitation of membership fees and donations from welfare clients. The solicitation of funds for charitable, religious, or political purposes, "involve[s] a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100

S.Ct. 826, 833, 63 L.Ed.2d 73 (1980); *see also Heffron v. International Society for Krishna Consciousness, Inc., supra; Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Thus, government regulation of such solicitation is permissible only when, as outlined above, the regulation is content-neutral, is reasonably related to the achievement of a valid governmental interest, and is no more restrictive than necessary to achieve that interest. " 'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone. . . .' " *Village of Schaumburg v. Citizens for a Better Environment, supra,* 444 U.S. at 637, 100 S.Ct. at 836 (quoting *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)).

In this case defendants seek to justify the complete ban on solicitation by arguing that it is necessary to prevent fraud. HRA administrator Martin Burdick testified that the HRA is concerned that welfare clients, on being solicited, are likely to be misled into believing that the organization representatives are employed by the HRA or that payment of a fee is a prerequisite to the receipt of welfare benefits. The district court's conclusion with respect to regulation [4] was as follows:

> I conclude that it is appropriate to deny any organization the right to solicit membership fees or contributions from public assistance recipients in the Center for the reasons given by Mr. Burdick. I find that, therefore, to be a reasonable regulation.

Slip op. at 5. And, apparently with respect to all of the regulations, the court stated "I do find that these regulations were legitimately promulgated to meet a need . . . ." *Id.*

Insofar as the court's statements dealt with the reasonableness of defendants' concern and the responsiveness of regulation [4] to that concern, we regard them as findings of fact and we find them not

"clearly erroneous." Fed.R.Civ.P. 52(a). Certainly the prevention of fraud is a legitimate and substantial governmental interest, *Village of Schaumburg v. Citizens for a Better Environment, supra,* and the HRA regulation, which is content-neutral in that it bans solicitation by all organizations inside the IMCs, appears to be directed to the prevention of fraud.

The court's conclusion, however, that the defendants' total ban on solicitation was "appropriate," and their promulgation of the regulations "legitimate[ ]" and "reasonable," goes beyond factfinding and is a conclusion that regulation [4] does not impermissibly infringe plaintiffs' First Amendment rights. Such a conclusion is not sustainable if the court has not properly applied First Amendment principles to the facts before it, and we are unable to conclude that the district court properly applied those principles with respect to regulation [4] since there is no indication that the court gave any consideration to whether the total ban is the least restrictive means of preventing the false impressions that defendants fear. We do not read the court's unexplicated finding that the regulations "were legitimately promulgated to meet a need" as a finding that no less restrictive means of preventing fraud were available. The court did not mention, even to reject, any possible alternative means. There was no evidence that less restrictive methods had been tried by the defendants, or had been evaluated by them and rejected; there was no evidence that less restrictive methods had even been considered. Nor was the potential efficacy of less restrictive means illuminated by any evidence as to the occurrence or nature of any actual instance in which a welfare client was led to believe that joining the Council or making a donation was necessary in order to obtain welfare benefits. Burdick testified simply to the HRA's concern, and plaintiffs were not permitted to inquire into any experiential basis for that concern.[6] While

---

**6.** Plaintiffs' recross-examination of Burdick proceeded as follows:

Recross-Examination

By Mr. Kresky [Plaintiffs' Counsel]:

Q. The question of the collection of dues, what is the basis for your conclusion that

we agree with the district court that, in the circumstances here, evidence of concrete instances of deception or client misapprehension was not necessary to establish the existence and appropriateness of defendants' concern, the occurrence and nature of such incidents, if any—or their nonoccurrence—might be relevant to an assessment of the need for a prohibition of all solicitation to cater to that concern.

In the course of preventing fraudulent solicitation, a total ban will necessarily also exclude good faith solicitation of fully informed clients. There may well be, in this case as in others, "a difference between reasonable regulation and total prohibition." *Albany Welfare Rights Organization v. Wyman, supra,* 493 F.2d at 1324 (rejecting complete ban on distribution of leaflets); *Wolin v. Port of New York Authority, supra,* 392 F.2d at 92–93 (rejecting complete ban on distribution of leaflets, carrying placards, setting up tables and convers-

ing with public). In *Albany Welfare Rights Organization v. Wyman, supra,* for example, which focused on distribution of leaflets rather than on solicitation of funds,[7] we stated that representatives of an organization could be required to "clearly designate themselves in an appropriate manner as not being employees of the [welfare department]." 493 F.2d at 1325 n.3. Here the efficacy of such a designation, coupled with the disclosure that no contribution to any organization is required in order to receive welfare benefits, should be considered before the total ban is upheld. The effectiveness of this method, or of other alternatives such as the posting of notices, would, of course, depend on a variety of factors such as the legibility of the disclosures, the clarity of their content, and the welfare client's attention to and comprehension of such disclosures. The appropriate factors should be evaluated by the district court on remand, bearing in mind that the defendants have

---

welfare recipients would think that they were being charged money in order to get their benefits if somebody was there asking them to join an organization and asking them to pay dues?

Ms. Axelsen [Defendants' Counsel]: Objection.

The Court: He didn't say that. He said he didn't want to leave the impression with anybody that you had to pay for getting your services in any way.

Mr. Kresky: I want to understand the basis for that impression.

The Court: The fact that that impression might be left with somebody?

Mr. Kresky: Yes.

Ms. Axelsen: I object to this line of questioning, your Honor. I object to the form of the question.

Mr. Kresky: If Mr. Burdick is being permitted to give his policy considerations, I think we ought to be allowed to explore—

The Court: The reason for them. You can give us the reason.

Ms. Axelsen: I believe Mr. Burdick has fully explained the reason for his policy.

The Court: Let's hear it one more time.

A. The issue of the collection of dues was discussed prior to its insertion into this letter and when people are on our premises we have no way of knowing whether or not they are representing themselves as official agents of the department, and we did not want to allow an opportunity for someone to have an impression when they came for public assistance or some other service within that In-

come Maintenance Center that a person who was there and asking for a dues collection or a membership fee was in any way being—and was being approached for that, was being approached for it with the sanction of the department.

Q. Have you ever received any report that any members of plaintiff organization had represented that they were employees of the welfare department and they were charging people to—

Ms. Axelsen: Objection.

The Court: I will sustain that. She is talking in the abstract. I think he testified about as far as he needs to go in this matter. I sustain that objection.

Q. Have you heard of any reports of those kinds of activities?

Ms. Axelsen: Objection.

The Court: Sustained.

Mr. Kresky: I have nothing further.

The Court: You are excused.

Tr. 371–73.

7. The opinion also stated that the *Albany* organization solicited welfare recipients for membership in the organization, 493 F.2d at 1321, 1322, and found it significant that "[p]rospective members of the [*Albany* organization] and persons who need information about public assistance are best found in the waiting rooms of County Welfare Centers." *Id.* at 1323. The opinion did not mention whether dues were sought.

the burden of proving that their total ban on solicitation of contributions is the least restrictive means of preventing welfare clients from being misled. *See Healy v. James, supra,* 408 U.S. at 184, 92 S.Ct. at 2347.

## CONCLUSION

The judgment is affirmed in part, and is vacated and remanded in part for further proceedings in accordance with this opinion. No costs.

MURPHY, District Judge, concurring in part, dissenting in part:

I concur in the Court's opinion except its vacation and remand of the District Court's Judgment which upheld the constitutionality of Regulation [4], and respectfully dissent from that part.

Because I believe a summary of the trial evidence will present the Regulation [4] issue more acutely, I begin at the beginning with the complaint.

The 14-page complaint, alleging a § 1983 violation, was a minicopy of the voluminous complaint in *Albany Welfare Rights Organization v. Wyman,* 493 F.2d 1319 (2nd Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). It sought a temporary and permanent injunction, a declaratory judgment, and damages and attorney's fees, alleging that each of the defendants' 5 regulations of March 15, 1977 and the granting of special privileges and status to defendants' Client Advisory Committee was unconstitutional. The temporary injunction was denied, and plaintiffs' appeal therefrom was withdrawn.

Plaintiff, New York City Unemployed and Welfare Council, "is an independent union of welfare recipients. Over 8500 members believe that welfare recipients and other poor people have the right to, and need, union representation in the decision-making processes which affect their lives." (Pltfs' Exhibit 6). The Council's president testified that some of its members paid its yearly dues of $1. and some did not, and all its workers were unpaid volunteers. There was other testimony that to help defray its office expenses it received about $1500 a month from an unidentified prosperous middle class group of contributors. The other plaintiffs are members of the Council. Defendants are officers of the Human Resources Administration, the agency of the City of New York which administers its welfare program.

"[C]onsideration of a forum's special attributes," the Supreme Court tells us, "is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in the light of the characteristic nature and function of the particular forum involved." *Heffron v. International Society for Krishna Consciousness, et al.,* 452 U.S. 640, 650, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981). We therefore detail the evidence relating to the enormity of the city's welfare program and its facilities and some of the problems inherent in the enterprise.

In 1980 there were 320,000 welfare recipients on the city's payroll. At one welfare center (Concourse) there were 176 employees. The daily average number of people who came to each of the city's 41 relief centers was 1500. Of these, an average of 1200 were welfare recipients, and the balance children or members of the recipients' families or interpreters. They form lines outside of the building each morning at 7:30 a. m.

Although 15 blueprints of 15 of the centers were offered and received in evidence, they have not been made part of the record on appeal and are not in this Court's or the District Court's files. Also, defendants' answers to interrogatories touching on these facts, for some unexplained reason were not offered in evidence. It appears, however, to be undisputed that 200 welfare recipients would be a fair average of those waiting at any given time on any given day in any one of the welfare centers' waiting rooms, and that the average waiting time for all recipients is about four to five hours. Each welfare recipient must meet with a case worker every six months to prove that he or she still needs assistance. The welfare re-

cipients' names are not announced over the loud speaker, and their anonymity is retained by announcing only their street addresses.

We quote and underscore Regulation [4] to emphasize its two prohibitions and the place:

"[4] Organizations will not be permitted to solicite [sic] *membership fees* or *contributions* from public assistance recipients in the *center*."

At trial, plaintiffs offered no evidence that they had solicited or tried to solicit membership fees or donations in any one of the 41 welfare centers, commonly called IMCs, at any time after March 15, 1977, the date of defendants' regulations, nor was there testimony as to how a waiting welfare recipient could be distinguished as one who would be owing or not owing a membership fee, or that he or she was a member of plaintiff Council's union. But there was testimony by a plaintiff witness how a welfare recipient would be solicited outside an IMC and if agreeable, $1. would be collected then and there and the recipient would be given a membership card in the union. As for contributions from welfare recipients, there was testimony by a plaintiff witness that they would not ask for contributions from such people because they could not afford any.

In its Statement of Claim, paragraph 41 of the complaint alleges only:

"41. Defendants' 'regulations' which prohibit the voluntary payment of membership dues violates the First and Fourteenth Amendments to the U. S. Constitution."

There was also substantial testimony relating to the disturbances inside and outside the Concourse Center and the resulting confusion and stoppage of defendants' work that they were required to do by statute; also that the plaintiffs' Council in some cases was also responsible for such disorder, and it was these disturbances that prompted the making of the written regulations. The same regulations were in existence before March 15, 1977 but they were not in writing.

In addition to members of plaintiffs' Council there are members of four other welfare organizations that come to the welfare centers to help improve the recipients' daily living by acting as an advocate for them, by advocating for more money, and representing them at hearings and distributing leaflets. Each organization has its own strategy and different approach with the welfare recipients, some have huge demonstrations, some come just to advocate, some try to approach the heads of defendants' agency. Plaintiffs' Council's strategy was described as the direct confrontation, good give-and-take approach to the emotions by rhetoric—demonstrations outside and attempts to come inside—some carry banners. All such groups were permitted without let or hindrance to canvass the recipients to induce them to join their respective groups. They are also allowed to post signs stating their aims and soliciting membership.

## DISCUSSION

After both sides rested, the District Court orally delivered its findings of fact and conclusions of law, beginning: "This is going to be necessarily somewhat disjointed. I make the following findings of fact and conclusions of law." Addressing itself to matters other than Regulation [4], it continued:

"I conclude that it is appropriate to deny any organization the right to solicit membership fees or contributions from public assistance recipients in the Center for the reasons given by Mr. Burdick. I find that, therefore, [it] to be a reasonable regulation * * *.

I do find these regulations were legitimately promulgated to meet a need and that the plaintiff's organization, albeit forceful, I gather has caused some problems vis-a-vis the city."

Then, after discussing the credibility of a witness for plaintiffs and the issue of attorney's fees, it concluded with the phrases: "As I stated, the foregoing constitutes the Court's findings of fact and conclusions of law. You may settle an appropriate judgment before me on notice."

Although appellants do not make any argument that any findings of fact are erroneous, the Court construes the District Court's oral findings of fact and conclusions of law relating to Regulation [4] without quoting the trial court's words or phrases, and holds that its "statements dealt with [a] the reasonableness of defendants' concern and [b] the responsiveness of Regulation [4] to that concern," [and] "we *regard* them as findings of fact and *we find* them not to be clearly erroneous." (Emphasis ours)

In sum, the Court "regarded" (A) the defendants' *concern* (we assume this equates with the District Court's words "for the reasons given by Mr. Burdick") was *reasonable, and* (B) the responsiveness of Regulation [4] to that concern (we assume this equates to the District Court's words: "I find therefore [it] to be a *reasonable* regulation.")

We respectfully submit that because the Court also found Regulation [4] to be content-neutral, such findings of fact and the fact that the defendants' waiting rooms are not public forums, the District Court's holding in *United States Postal Service v. Council of Greenburgh Civic Associations, et al.,* 453 U.S. 114, 131 fn.7, 101 S.Ct. 2676, 2686 fn.7, 69 L.Ed.2d 517 (1981), four months later (*infra*, p. 9).

We further respectfully submit that although preventing of fraud is a legitimate government interest, as this Court points out, fraud or the prevention of it was not the subject matter of Burdick's testimony. He never mentioned the word, nor do the defendants in their brief. The HRA was concerned with the potential that the waiting welfare recipients in the center might feel that being solicited for contributions or dunned for dues not paid, that they had to pay for public assistance.

Again, instead of quoting Regulation [4] *in haec verba* and the phrases of the trial court, and using the word "conclusion" as distinguished from the Court's words "I conclude," the Court holds that the "court's conclusion * * * that the *defendants'* total ban on solicitation was 'appropriate' and their promulgation of the regulations 'legit-

imate' [ ] and 'reasonable,' goes beyond fact finding, and is a conclusion that regulation [4] does not impermissibly infringe plaintiffs' First Amendment rights." With such premise the Court's holding is that the District Court should have considered if such a ban was the least restrictive of preventing the false impression that defendants feared. Such holding, we respectfully suggest, is a rephrasing of the trial court's words, and converting a finding of fact into a conclusion of law which, of course, is not protected by the "clearly erroneous" doctrine of Rule 52(a) F.R.Civ.P. A fair reading of the District Court's words:

"I conclude that it is appropriate to deny any organization the right to solicit membership fees or contributions from public assistance recipients in the Center for the reasons given by Mr. Burdick. I find that, therefore, [it] to be a reasonable regulation * * *."

I do find these regulations were legitimately promulgated to meet a need * *."

we submit our findings of fact that a correctly instructed jury could return as a general verdict accompanied by answers to interrogatories. Rule 49(b) F.R.Civ.P.

We in turn submit that such further inquiry is necessary only if a public forum is involved. *United States Postal Service v. Council of Greenburgh Civic Associations, et al.,* 453 U.S. 114, 131 fn.7, 101 S.Ct. 2676, 2686 fn.7, 69 L.Ed.2d 517 (1981), *infra*, p. 9.

The Court quotes the entire recross-examination of Burdick to show that at least plaintiffs' counsel was seeking to learn from Burdick whether there was any experimental basis for defendants' concern, but was prevented by the Court. Actually, the question was improper on recross, since the subject matter was not explored either on direct or cross, or redirect.

And finally, the Court suggests that in preventing fraudulent solicitation (Regulation [4] does not use the word "fraudulent") a total ban will necessarily also exclude good faith solicitation of fully-informed clients. This must be like it is in heaven.

Relevant also, here, is the Court's argument that there was no finding of the wel-

fare recipients' actual impressions, assuming such proof would be admissible against these plaintiffs. Nor, we might add, did plaintiffs submit any contrary proof, either as to prospective or past impressions. Neither was there any such intrinsic evidence before the state courts of Ohio in *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), to have persuaded the late Mr. Justice Douglas, concurring (or the plurality), to place or not to place his or its imprimatur on the proposed advertisement in the city's buses, but he nevertheless concluded that: "I do not believe that petitioner has any constitutional right to spread the message before this captive audience." (p. 308, 94 S.Ct. p. 2720).

*Albany, supra,* upon which this Court relies, also involved a welfare center. There, the welfare rights organization had been enjoined by the District Court from entering the first floor waiting room for welfare recipients to distribute leaflets. This Court dissolved the injunction and ordered the District Court to permit at least one person of the plaintiff's organization to enter the waiting room to distribute leaflets and talk with the waiting welfare recipients. We submit *Albany's* holding does not resolve the prohibited solicitations in our case. Here the solicitation involves the solicitation of membership fees or contributions from waiting welfare recipients in 41 IMCs in New York City. The solicitation of union *fees,* owed or not owed by welfare recipients, who are or are not members of plaintiffs' Council, is not protected free speech but buckshot dunning for debts that might not be owing. Neither is a captive audience, in our opinion, a proper audience for solicitation of contributions by these plaintiffs, who never asked welfare recipients for contributions because they could not afford them.

We, of course, do not and cannot quarrel with the established principle that charitable solicitations are within the protections of the First Amendment.* However, we cannot endorse the practice in all situations as protected speech because it is permissible

in some. The difference must be, we submit, in the web of circumstance, either under concepts of public forums or limited public forums, private or publicly-owned property, purpose and validity of the state's interest and the rights of persons solicited, and the type of the audience. Such protected speech, we submit, is not an absolute principle. Even Jefferson's famous words: "We hold these truths to be self-evident,— that all men are created equal * * * ", cannot withstand many facts of life.

*Albany,* we submit, does not resolve many of these issues. The issue whether the waiting rooms are or are not public or limited forums was not decided, the issue of a captive audience was not decided, whether the group of waiting welfare recipients was a relative audience does not really come to grips with whether or not they are a captive audience. We respectfully submit that the welfare recipients' waiting rooms in New York City's 41 welfare centers are not public or limited public forums but are, indeed, but holding stations for the most pitiful captive audiences in our country, who, of course, can say "No" and walk away empty-handed. They wait five hours for this privilege?

I submit and conclude that we are bound in this case by *United States Postal Service v. Council of Greenburgh Civic Associations, et al.,* 453 U.S. 114, 131 fn.7, 101 S.Ct. 2676, 2686 fn.7, 69 L.Ed.2d 517 (1981), wherein the Court answers Justice Marshall's disagreement "with the Court's assumption that if no public forum is involved, the only First Amendment challenges to be considered are whether the regulation is content-neutral * * * and reasonable * * *." To which the Court answered:

"What we hold is the principle reiterated by cases such as *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), and *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), that property owned or controlled by the government which is not a public forum may be subject to a prohibition of speech, leafleting, picketing, or other forms of

---

* In *Hynes v. Mayor of Oradell*, 425 U.S. 610, 619, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976), the

Court cited with approval Professor Chaffee's low opinion of house-to-house canvassing.

communication without running afoul of the First Amendment. Admittedly, the government must act reasonably in imposing such restrictions. *Jones v. North Carolina Prisoners Labor Union*, 433 U.S. 119, 130–31, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977), and the prohibition must be content-neutral."

The Supreme Court's footnote 6, also in *United States Postal Service*, would seem to batten down our submission, namely:

"Even Justice Marshall's dissent recognizes that the government may defend the regulation here on a ground other than simply a 'time, place and manner basis.' For example, he says in his dissent, p. 2688, that: 'The question, then, is whether the statute burdens any First Amendment rights enjoyed by appellees. If so, it must be determined whether this burden is justified by a significant governmental interest substantially advanced by the statute.' We think § 1725 satisfies even the test articulated by Justice Marshall." (p. 2686)

The judgment of the District Court should be affirmed in its entirety.