742 F.2d 718
 NEW YORK CITY UNEMPLOYED AND WELFARE COUNCIL, Alma Brooks,
James Scott and Phyllis Bolding, Plaintiffs-Appellants,
v.
Stanley BREZENOFF, as Administrator/Commissioner of the New
York City Human Resources Administration and Commissioner of
New York City Department of Social Services; Barbara Blum,
as Commissioner of the New York State Department of Social
Services; Herbert Rosenzweig, as Deputy Administrator of
Income Maintenance Programs of the New York City Human
Resources Administration; Burt Chevers, as Director of the
Income Maintenance Client Advisory Section; and the Client
Advisory Committees of New York City's Income Maintenance
Programs, Defendants-Appellees.
 No. 1484, Docket 84-7031.
 United States Court of Appeals,
Second Circuit.
 Argued June 21, 1984.
Decided Aug. 20, 1984.
 
 Harry Kresky, New York City, for plaintiffs-appellants.
 Trudi Mara Schleifer, New York City (Frederick A.O. Schwarz, Jr., Corporation Counsel, Francis F. Caputo, New York City, of counsel), for defendants-appellees.
 Before MESKILL, CARDAMONE and ROSENN,* Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 The New York City Unemployed and Welfare Council (the Council) and three of its members appeal from orders of the United States District Court for the Southern District of New York, Owen, J. On remand from this Court, Judge Owen dismissed the remaining portions of the Council's complaint seeking the right to solicit dues in New York City welfare offices; in his earlier decision, he denied the Council's claim for attorney's fees. We affirm.
 
 BACKGROUND
 
 2
 The facts were previously reported in our first opinion in this case. New York City Unemployed and Welfare Council v. Brezenoff, 677 F.2d 232 (2d Cir.1982) (Brezenoff I ). Some familiarity with them will be assumed.
 
 
 3
 The Council is an organization of about 10,000 welfare recipients and is funded largely by dues and donations. It charges one dollar per year to its members, although some members pay no dues. Its primary purposes are apparently to educate welfare recipients as to their legal rights, improve conditions at welfare offices and fight poverty.
 
 
 4
 The primary focus of the Council's activities is the approximately forty New York City welfare offices, also known as Income Maintenance Centers (IMCs). Welfare applicants and recipients, collectively referred to as "clients," go to the IMCs to receive emergency welfare checks and food stamps, obtain information about eligibility requirements, receive assistance with applications or finances and in general to talk with welfare workers. The IMCs are open to the public.
 
 
 5
 The New York City Human Resources Administration (HRA), a city agency that administers the city's welfare program, promulgated regulations which restricted the activity of outside organizations within the IMCs. Those restrictions included limits on the locations within the IMCs where organization representatives could speak with welfare clients and distribute literature, and a total ban on the solicitation of membership fees or contributions from welfare clients within the IMCs. Plaintiffs-appellants initially brought this action to challenge the regulations and other HRA practices and sought injunctive relief and damages.
 
 
 6
 The district court denied all of the relief sought by the Council, except that it ordered one minor modification in the regulations. With respect to the issue on this appeal, the district court held that the solicitation ban was reasonable as a means of preventing fraud or misrepresentation. Specifically, it accepted HRA Administrator Martin Burdick's testimony "that welfare clients, on being solicited, are likely to be misled into believing that the [Council representatives] are employed by the HRA or that payment of a fee [to the Council] is a prerequisite to the receipt of welfare benefits." Brezenoff I, 677 F.2d at 239. We affirmed the district court judgment in large part, but vacated and remanded the court's holding regarding the solicitation ban. We remanded because we were "unable to conclude that the district court properly applied [First Amendment] principles ... since there [was] no indication that the court gave any consideration to whether the total ban is the least restrictive means of preventing the false impressions that defendants fear." Id. at 239. Our remand thus directed the district court to consider whether the total ban on solicitation was the least restrictive means of achieving the HRA's ends, with the burden of proof on the HRA. Id. at 240-41.
 
 
 7
 On remand, the district court took further testimony and subsequently issued an order dismissing the remainder of the complaint. It considered other alternatives, but concluded that the solicitation ban was the least restrictive means of effectively guarding against fraud or misrepresentation. It also considered for the first time the HRA's contention that the ban was necessary to prevent theft in the IMCs and dismissed the remainder of the complaint on this alternate ground as well. Plaintiffs appeal.
 
 DISCUSSION
 
 8
 Charitable solicitations that are used to support speech and the dissemination of information are clearly within the First Amendment's protection of speech. See, e.g., Secretary of State of Maryland v. Joseph H. Munson Co., --- U.S. ----, ---- - ----, 104 S.Ct. 2839, 2847-49, 81 L.Ed.2d 786 (1984); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). This does not mean, however, that charitable solicitations may not be regulated or even prohibited in appropriate circumstances. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). We are here asked for the second time to decide whether the First Amendment guarantees an organization of welfare recipients the right to solicit contributions in lobbies of welfare offices. We hold that it does not.
 
 
 9
 In Brezenoff I, we held that a welfare office is to be treated as a public forum for the purposes of speech pertaining to welfare issues. However, " '[a] welfare office is not to be equated with a public street.' " Albany Welfare Rights Organization v. Wyman, 493 F.2d 1319, 1323 (2d Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) (quoting Massachusetts Welfare Rights Organization v. Ott, 421 F.2d 525, 527 n. 4 (1st Cir.1969)). Because a welfare office is government property that is not traditionally or by designation a public forum, see Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 42-46, 103 S.Ct. 948, 953-55, 74 L.Ed.2d 794 (1983), the government entity operating it is entitled to preserve it for its intended use. Id. at 46, 103 S.Ct. at 955 (quoting Adderley v. Florida, 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966)). Where the type of speech in question is " 'basically incompatible' " with the intended use of the government property, the government "may impose reasonable time, place or manner restrictions on its exercise or may, in cases of unavoidable incompatibility, bar speech altogether." Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050, 1054 (2d Cir.1983) (quoting in part Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972)). Content-neutral time, place or manner restrictions unrelated to the suppression of free expression are valid if "they are narrowly tailored to serve a significant governmental interest and ... leave open ample alternative channels for communication." Clark v. Community for Creative Non-Violence, --- U.S. ----, ----, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984); see, e.g., Members of the City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, ---- - ----, 104 S.Ct. 2118, 2129-30, 80 L.Ed.2d 772 (1984).
 
 
 10
 A blanket prohibition of a particular type of speech in a public forum may sometimes be a reasonable time, place or manner restriction. For example, in Clark v. Community for Creative Non-Violence, --- U.S. ----, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the Supreme Court held that "symbolic sleep" in a Lafayette Park tent city that was intended to demonstrate the plight of the homeless could be banned altogether. It reached this conclusion even though demonstrations could not be generally banned in the park because it is a traditional public forum, see, e.g., United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983); Perry Education Association, 460 U.S. at 42, 103 S.Ct. at 953. The relevant content-neutral restrictions prohibiting camping were valid because they were narrowly drawn to serve the important governmental interest of conserving park property and because there were other areas where the campers could engage in "symbolic sleep."[1] --- U.S. at ---- - ----, 104 S.Ct. at 3069-72. The regulations could therefore be constitutionally applied to a group of individuals that intended to use camping in Lafayette Park as a mode of expression.
 
 
 11
 In the case at bar, the HRA regulation prohibiting solicitation in IMCs is certainly content-neutral; it does not discriminate in favor of or against solicitation used to support any particular viewpoint. Brezenoff I, 677 F.2d at 239. The governmental interest used to justify the solicitation ban, prevention of fraud, is a substantial one. Id. We must therefore consider whether the solicitation prohibition is no broader than necessary to serve the HRA's interest, and whether its implementation would leave open adequate alternative channels of communication.
 
 
 12
 In the remand decision that is the subject of this appeal, the district court found that there were no reasonable means short of a complete ban on solicitation to further the HRA's interest in preventing fraud. It held:
 
 
 13
 I do note that a statement could presumably be framed which the plaintiff's solicitors would be required to make at the outset of each solicitation or posters could be designed that would carry a disclaimer of those facts which are the department's concern. However, any assurance that the disclaimers would be understood by sufficient solicitees and the department's necessary reliance on plaintiff's solicitors for that assurance is more questionable. I do not see it as an answer that in order to permit solicitation by plaintiff--and other organizations that would necessarily be allowed simultaneous rights--the welfare department must employ extra security guards, monitors and translators to deal with the perceived risks.
 
 
 14
 New York City Unemployed and Welfare Council v. Brezenoff, No. 80 Civ. 5757(RO), slip op. at 3 (Dec. 14, 1983) (footnote omitted). The court was especially concerned with possible language barriers, as it noted that "[t]he problem of communication with welfare recipients who only speak Spanish or Polish or Vietnamese immediately raises itself." Id. at 3 n. 5.
 
 
 15
 We remanded this case to the district court in Brezenoff I because we were not convinced that it had properly considered whether there were less restrictive means of preventing fraud, short of a complete ban on solicitation. We said, "The court did not mention, even to reject, any possible alternative means." 677 F.2d at 239. On remand, however, the district court acknowledged that it had to consider whether there were less restrictive means of preventing fraud, slip op. at 2, and did "mention, even to reject," possible alternative means (posters or other disclaimers), slip op. at 3. The district court applied the proper law to the specific facts on remand, and its finding that the only reasonable way to serve the HRA's interest in preventing fraud was to ban solicitation altogether is a finding of fact. See Grausam v. Murphey, 448 F.2d 197, 201 (3d Cir.1971), cert. dismissed, 405 U.S. 981, 92 S.Ct. 1207, 31 L.Ed.2d 257 (1972). We cannot set aside this finding of fact unless it is clearly erroneous, Fed.R.Civ.P. 52(a), i.e., unless we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 16
 We cannot say that the district court's finding is clearly erroneous. The uncontradicted testimony was that IMCs are crowded and noisy areas in which welfare clients--often accompanied by children--are forced to wait for long periods of time before they can be seen by an HRA worker. Tr. at 68-69. Appellants acknowledged that waiting welfare clients are sometimes angry, anxious or tense. Tr. at 102. Some welfare clients are limited in their English speaking abilities; many of those individuals are Spanish speaking, while others speak languages such as Russian, French or Greek. Tr. at 69. Of course, individuals who receive welfare payments are often acutely in need of that assistance, see Shapiro v. Thompson, 394 U.S. 618, 629, 89 S.Ct. 1322, 1328, 22 L.Ed.2d 600 (1969), and cannot simply walk out of the welfare office if they do not wish to converse with a solicitor. Unlike the homeowners or apartment dwellers in Village of Schaumburg, welfare clients wait in IMC lobbies "as a matter of necessity, not of choice" and are truly a captive audience for whom " '[t]he legislature may recognize degrees of evil and adapt its legislation accordingly.' " Lehman v. City of Shaker Heights, 418 U.S. 298, 302, 94 S.Ct. 2714, 2716, 41 L.Ed.2d 770 (1974) (plurality opinion) (citation omitted) (quoting in part Packer Corp. v. Utah, 285 U.S. 105, 110, 52 S.Ct. 273, 274, 76 L.Ed. 643 (1932)); see also City Council v. Taxpayers for Vincent, --- U.S. at ----, 104 S.Ct. at 2129. These individuals may well be peculiarly susceptible to verbal misrepresentations, whether because of the noisy and crowded atmosphere of an IMC lobby, language barriers, or even a misperceived need to do anything necessary to ensure the receipt of welfare checks or to lessen the wait in the IMC--including paying money to a solicitor. Since the HRA cannot reasonably ensure that solicitors will not make such misrepresentations to the captive audience, the district court could rationally find that the only reasonable way to further the HRA's interest in preventing fraud is to prohibit solicitation altogether.
 
 
 17
 For the above reasons, we cannot say that the district court erred in holding that the HRA need not rely on Council signs, badges or other written disclaimers in order to further its interest in preventing fraud. Signs may not be seen or understood, may not be consistent with verbal representations, or may not be consistent with the solicitees' perceptions of the verbal representations. The HRA is not required to trust that groups soliciting money will always make accurate representations, when their solicitees are a captive audience on city property not intended for anything other than official business and not normally used as a public thoroughfare.
 
 
 18
 The Council argues that the HRA's restrictions are constitutionally impermissible because HRA's interest in preventing fraud is "hypothetical," in that there have been no reported cases of solicitation fraud in IMC lobbies. We disagree. The HRA does not have to wait for the first cases of fraud to be reported before it can promulgate regulations that otherwise would be reasonable to meet its legitimate interest in preventing fraud. Cf. Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (complete prohibition of political speech on military base upheld in order to prevent harm to military morale, even though no previous harm to morale from political speech had evidently been shown). Although we stated in Brezenoff I that evidence of specific instances of misconduct would be relevant to a determination of whether a blanket prohibition of solicitation was necessary, 677 F.2d at 240, we also stated that a lack of such evidence would not be dispositive. Id. at 239-40. Since we find that the HRA's regulations were reasonable and appropriate and that the district court's findings were not clearly erroneous, the lack of prior instances of misconduct does not mandate reversal.
 
 
 19
 The Council suggests that disclaimers stating that the Council is not affiliated with the HRA and that payment of Council dues is not required for the receipt of welfare payments could be mailed to welfare recipients along with their checks. We find this alternative unacceptable. Mailed disclaimers may be easily overlooked or forgotten and would not be received at all before the solicitation by those who were in the IMCs merely to apply for welfare. The HRA, like a private person, has a legitimate and important interest in limiting its mailings--which it pays for--to include only matters it considers related to its own welfare program. Cf. Consolidated Edison Co. v. Public Service Commission of New York, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). Furthermore, if the HRA were required to include information about the Council in order to protect the Council's solicitation rights, it would have to do so for every group that wanted to and could solicit on IMC property. Federal courts need not impose unreasonable or unduly burdensome requirements on government entities in order to protect speech.[2]
 
 
 20
 Finally, there are ample alternative forums for the Council to solicit dues. The Council could, for example, solicit dues on sidewalks outside of the IMCs. The city could not ban solicitation altogether in these "traditional" public forums. See United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). The Council could thus direct welfare clients to the outside solicitors in order to collect dues and the outside solicitors would not be denied access to their audience. Alternatively, the HRA has indicated that it would be less opposed to the Council's handing out stamped, self-addressed envelopes in which dues could be remitted than to direct solicitation in IMC lobbies. Tr. at 72-73. The fact that these alternate methods of communication do not provide the Council with the best possible forum does not establish a constitutional violation. Cf. City Council v. Taxpayers for Vincent, --- U.S. at ---- n. 30, 104 S.Ct. at 2133 n. 30.
 
 
 21
 The HRA has much more experience managing welfare offices than the courts have and must be given some discretion in determining what its interests are and how best to further them. Cf. Clark v. Community for Creative Non-Violence, --- U.S. at ----, 104 S.Ct. at 3072. It has not sought to ban all speech related to welfare issues, but only the speech that may impinge on the government's interest in preventing fraud. In light of the district court's findings, we cannot say that the HRA has sought to achieve impermissible goals or that its means for achieving these goals are unreasonable.[3] Accordingly, we conclude that the district court did not err in dismissing the remainder of the Council's complaint.[4]
 
 
 22
 Affirmed.
 
 
 
 *
 Honorable Max Rosenn, United States Circuit Judge for the Third Circuit, sitting by designation
 
 
 [1]
 Although the Supreme Court was considering restrictions on symbolic speech, it used the same legal analysis that it would have used for content-neutral restrictions on pure speech. See --- U.S. at ---- - ----, 104 S.Ct. at 3068-69
 
 
 [2]
 The Council also suggested that it should be allowed to hand out "authorization cards" in order to avoid the passage of money inside the IMCs. Tr. at 78-81. Apparently its proposal was to have the one dollar dues deducted from welfare clients' checks and sent directly to the Council. The district court excluded testimony regarding this plan as lacking in foundation; we do not find that its ruling was an abuse of discretion. Although the Council suggested that this was the "least restrictive alternative," the alternatives that the government entity must adopt in order to protect speech need not be unreasonable or unduly burdensome
 The Council's suggestion that the HRA should provide for the election of a "Welfare Congress" of welfare recipients to oversee dues solicitation and determine whether dues solicitees were being misled, Plaintiffs' Post-Trial Brief at 10, was rejected by the district court and has apparently been abandoned on this appeal.
 
 
 [3]
 Because the district court was not clearly erroneous in holding that no less restrictive means than a total solicitation ban could reasonably prevent fraud or misrepresentation, we affirm on that ground. While we do not quarrel with the district court's finding that theft may be another potential problem, we do not rule on its holding that a solicitation ban was the least restrictive means to prevent theft. We note that the district court "did not mention, even to reject, any possible alternative means" to a total ban on solicitation that would further the HRA's interest in preventing theft in its IMCs; thus, we cannot affirm on that ground. See Brezenoff I, 677 F.2d at 239
 We are further troubled by the fact that the theft interest was introduced at an extremely late stage of the proceedings. It was not brought up in the first trial (except possibly through a cursory reference to the HRA's need to "maintain order," Memorandum of Law on Behalf of Defendant Brezenoff, at 8), and it was apparently not argued in the first appeal. It was also not mentioned at the beginning of the second trial. When counsel for the city described the case she was about to put on, she stated that the solicitation ban furthered the governmental interest of preventing misrepresentation; she said nothing about theft. Tr. at 3. Nonetheless, the city then brought in a security guard who testified that theft might be a concern.
 We have previously stated that it is highly improper for a defendant to raise new defenses on remand that were not discussed in this Court's earlier mandate(s) in the case. The Council may have been unfairly surprised by the testimony, although it did not object on that ground or request a continuance to rebut the testimony. However, the defendant should have first applied to this Court for a modification of the mandate in order to allow the district court to consider the new defense. See Riley v. MEBA Pension Trust, 586 F.2d 968, 970-72 (2d Cir.1978).
 Because the district court did not err in holding that a total ban on solicitation was the least restrictive means to further the HRA's legitimate interest in preventing fraud, and because that holding is independent of any holding relating to theft interests, we affirm the judgment of the district court on the "prevention of fraud" ground alone.
 
 
 [4]
 In its first decision, the district court denied plaintiffs' request for attorney's fees. Plaintiffs appealed on this issue. We did not address it in Brezenoff I because it was still unclear at that time how much relief plaintiffs would obtain. After remand, but before the district court's second decision, plaintiffs moved for attorney's fees. The record does not indicate that the district court ever formally ruled on this motion, or that plaintiffs ever renewed it after a final decision in the case. Plaintiffs now appeal the denial of attorney's fees for the second time. Because plaintiffs did not obtain any further relief after the district court denied attorney's fees in its first decision, and because this Court did not rule on the attorney's fees question in Brezenoff I, we treat plaintiffs' present appeal from the denial of attorney's fees as relating back to their first appeal. We therefore regard this appeal as having been timely taken from a final order
 The amount of an attorney's fee award under 42 U.S.C. Sec. 1988 (1982), under which we treat the requests for attorney's fees as having been brought, is within the discretion of the district court. Hensley v. Eckerhart, 461 U.S. 424, 438, 103 S.Ct. 1933, 1942, 76 L.Ed.2d 40 (1983). While that amount should be geared to the degree of success achieved by the plaintiff, id. at 435, 103 S.Ct. at 1940, we view the plaintiffs' level of success in this action as de minimis. Compare Complaint at 12-14 with Brezenoff, I, 677 F.2d at 235 n. 4, and No. 80 Civ. 5757, slip op. at 4 (Apr. 22, 1981). The district court's denial of attorney's fees in this instance is "reasonable in relation to the results obtained." Hensley v. Eckerhart, 461 U.S. at ----, 103 S.Ct. at 1942. Therefore, we affirm the denial of attorney's fees. See Kentucky Association for Retarded Citizens, Inc. v. Conn, 718 F.2d 182 (6th Cir.1983); see also Ohland v. City of Montpelier, 467 F.Supp. 324, 349-50 (D.Vt.1979).