Marthaann E. PITTS, et al. Plaintiffs,

v.

Robert S. BLACK, et al., etc. Defendants.

No. 84 Civ. 5270 (MJL).

United States District Court, S.D. New York.

Oct. 9, 1984.

Robert M. Buschman, Ogden N. Lewis, Catherine V. Curry, Deborah S. Guyol, New York City, for plaintiffs.

Robert M. Hayes, New York City, for plaintiffs Coalition for the Homeless.

Susan Rosenberg, Antonia Levine, Michael C. Harwood, Asst. Corp. Counsel, Corp. Counsel of the City of New York, New York City, for defendant City of New York.

Marion Buchbinder, Judith A. Gordon, Asst. Atty. Gen., New York City, for defendant State of New York Attorney General's Office.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Who are to be the electors ...? Not the rich more than the poor, not the learned, more than the ignorant, not the haughty heirs of distinguished names, more than the humble sons of obscure and unpropitious fortune. The electors are to be the great body of the people of the United States.

The Federalist No. 57 (J. Madison)

The plaintiff class seeks a permanent injunction and a declaratory judgment prohibiting the present practice of the New York City Board of Elections ("City Board"), acting with the advice and support of the New York State Board of Elections ("State Board") from applying the New York State Election Law ("Election Law") in such a manner as to completely disenfranchise the plaintiff class.

Plaintiffs allege that they are "homeless" persons in that they do not have traditional residences. They further allege that they reside in the State of New York and but for the fact that they do not live in traditional residences they meet the statutory requirements for eligibility to register to vote in all other respects.

Plaintiffs claim that the defendants' application of the Election Law in such a manner as to disenfranchise plaintiffs' class, violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[1]

---

1. In this Court's Opinion and Order granting plaintiffs' application for a preliminary injunction, dated September 25, 1984, this Court dismissed plaintiffs' second claim asserting that defendants' application to plaintiffs of the Election Law contravenes the New York State Election Law and plaintiffs' third claim that defendants' conduct violates provisions of the New York State Constitution. In *Pennhurst, et al. v. Halderman, et al.,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) the Supreme Court held that the Eleventh Amendment to the United States Constitution prohibited a federal district court from ordering state officials to conform their conduct with state law.

Federal jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1983. The issue for determination in this lawsuit is the constitutionally permissible definition of the term "residence" used in Section 1–104(22) of the Election Law.[2] The term "residence" is defined in that Section as, "that place where a person maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return."[3]

Plaintiffs view the term residence as the act of being in one geographical locale, where one performs the usual functions of sleeping, eating and living in accordance with one's life style, and a place to which one, "wherever temporarily located" always intends to return. The named plaintiff, Dyer, testified at trial:

Q: Mr. Dyer, you said that you live in St. Gabriel [sic] Park, is that correct?

A: Yes.

Q: And St. Gabriel [sic] Park is approximately one block square, is that correct?

A: Yes, it is.

Q: And you sleep in the park on any one of six benches located around the baseball diamond, is that right?

A: Yes.[4]

THE COURT: Mr. Dyer, when you spoke, of these places where you have slept,[5] . . . for I think you said a couple of nights, I am asking you about your intent now, did you intend that those places that you slept were your home?

THE WITNESS: No, I've always sort of considered St. Gabriel [sic] Park as my home park or my home base.[6]

Defendants maintain that the term "residence" necessarily implies the occupancy of a fixed premises. Mr. Thomas Wallace, Executive Director of the New York State Board of Elections testified,[7]

Q. Mr. Wallace, do you believe that an individual who gives a park bench as his address would be a resident of the State of New York entitled to register to vote?

A. In my own opinion, I do not believe he could qualify under the statutory provisions defining residency.

Q. Can you tell us why, please?

A. The statute requires a fixed, permanent home and whenever temporarily absent, the person intends to return. I see that definition as carrying with it a requirement that the person have a right to the physical location, to the property.

Betty Dolen, Executive Director of the New York City Board of Elections testified,[8]

Q. Mrs. Dolen, one general question. Is it the position of the City Board of Elections presently that the homeless who do not live in shelters or welfare hotels may not register to vote?

A. That is the position the Board has taken.

2. In addition to Section 1–104(22), Section 5–102 of the Election Law sets forth three requirements for registration: Citizenship (United States), age (eighteen years or over), and duration of residence in New York State and in the county, city or village in which registration is sought (thirty days).

3. The term "residence" has been interpreted by the New York courts to be equivalent to "domicile", and is "dependent upon the applicant's expressed intent, his conduct and 'all attendant surrounding circumstances'". *Palla v. Suffolk Co. Bd. of Elections*, 31 N.Y.2d 36, 334 N.Y.S.2d 860, 286 N.E.2d 247 (1972) (citation omitted).

4. Transcript of trial dated October 4, 1984, hereinafter ("Tr.") pp. 54–55. References to the preliminary injunction hearing transcript are indicated by the page number, *e.g.*, Preliminary Injunction "Tr." References to deposition testimony admitted into evidence are indicated by witness and deposition page number *e.g.*, "Tannenbaum 25". Plaintiffs' exhibits are indicated by "Pl. Ex.", and defendants' exhibits by "Def. Ex." Individual pleadings are separately designated, *e.g.*, "Complaint". The Memorandum Opinion and Order dated September 25, 1984 is indicated by "Memorandum Opinion".

5. Dyer testified that in the cold months he slept in Grand Central Station. During the year he would also sleep for one or two nights in a shelter or at a friend's house.

6. Tr. 72–73.

7. Tr. p. 192.

8. Tr. p. 185.

### DISCUSSION

█ Limitations on the exercise of the franchise must be subjected to strict judicial scrutiny and the burden of justification for restrictive measures must be borne by those who would impose such limitations. *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Although substantial and compelling interests may be alleged, a state may not choose the way of greater interference when less onerous alternatives are available. "If it acts at all, it must choose less drastic means." *Id.* at 343, 92 S.Ct. at 1003.

Defendants' definition of the term "residence" excludes an entire group of otherwise eligible voters. Defendants assert that such exclusion is necessary in order to protect valid state interests: *First,* in ensuring that the voter has a verifiable nexus to the community from which he or she votes; *Second,* protection of the integrity of the ballot by preventing fraudulent voting practices; and *Third,* administrative feasibility.

█ When an equal protection challenge is made to the constitutionality of a statute, as applied to a particular class, it is necessary to define the class so that the Court may review the character of the classification, the individual interests effected by the classification, and the governmental interests asserted in support of the classification.

### A.   *Who Are The Homeless*

At trial plaintiffs called Mr. Kim Hopper to testify. The Court accepted Mr. Hopper as an expert witness on the subject of the homeless in the City of New York.[9] Mr. Hopper testified that fifteen years ago it would have been relatively simple to define the homeless population because they were a rather homogeneous group of white males in the mid to late fifties, a third of whom had severe drinking problems and who generally resided on the Bowery "as a sort of cheap, degrading retirement." About a third of this population occasionally worked, the balance subsisted on pensions, handouts and the municipal shelters.[10]

In the late 1960's and early 1970's as a result of the destruction of cheap housing stock[11] due to urban renewal projects, the character of the homeless population changed. By the mid-1970's, in New York City, the homeless were primarily black males who were jobless and by the end of the decade, forty percent of those seeking public shelter stated the lack of a job as the primary reason for their impoverishment. Another addition to this group were women and families, ninety percent of whom by 1973, were rehoused in public housing or welfare hotels. In sum, Mr. Hopper testified that a census of the homeless in New York City would show:

> [M]en and women of all ages, they are predominantly minority, many of them have worked. Usually some dislocating event occurred, loss of a job as in Mr. Dyer's instance,[12] almost invariably a number of intermediate arrangements are tried, being put up with friends or family is the most common one, but as I

9. Mr. Hopper testified that he serves on the Governor's Task Force on Homelessness, as an advisor to the American Psychiatric Association's Task Force on Homelessness, as an advisor to the National Institutes of Mental Health (Community Support-Program Planning Session), and as a consultant to the New York State Department of Social Services recent study of the homeless.

10. Tr. 84.

11. Mr. Hopper testified that since the early 1970's something like eighty-two percent of SRO (Single Room Occupancy) housing has been lost in New York City. The homeless population was also increased during this period by the policy of "deinstitutionalization" of those with mental disabilities from the psychiatric institutions.

12. Plaintiff Dyer testified at the preliminary injunction hearing that he worked from 1971 to 1981 for the American Indian Community House in various capacities, the last, as Special Projects Coordinator. He lost his job because of program funding cuts. In August, 1981 he left his apartment because he could no longer afford the rent and has since lived in St. Gabriels Park.

think, the City's most recent survey showed, the precipitating event leading to homelessness is eviction, formal or informal in most of the cases.[13]

Mr. Hopper testified that the demand for shelter over the last five years has increased for men almost thirty percent per year and for women sixty percent per year. He stated that,

The City projects an increase of twenty-five percent in shelter demand by the peak of this winter, but I have been told the figures are being revised, I expect upwards.[14]

Not only will the City be unable to meet the demand for shelter, but many of the homeless who live on the streets, approximately eighty to eighty-five percent, have had some experience in City shelters, which caused them to choose not to return. Again, Mr. Hopper:

In our research the reasons usually given included personal threat of injury, particularly amongst the elderly or more disabled, the threat of lice infestation in particular, the threat of robbery, clothes can still be a scarce item on the street, good clothes, and people in the flops that I visited and slept in tended to sleep in their clothes both for reasons of warmth and to make sure they had them when they woke up, and simply for some people they elect to preserve whatever threats of dignity and self-respect are left them rather than submit to what they found to be often a degrading and humiliating experience in the offer of shelter.

\* \* \* \* \* \*

But I think fear and self-respect, both of which I found to be justified concerns, were the dominant reasons for the rejec-

tion of the public shelters and the election of one's own best efforts.[15]

### B. *Nexus to the Community*

Defendants contend that they have a compelling interest, recognized by the Courts,[16] in assuring that voters have a verifiable connection with the locality from which they vote. The requirement of a fixed premises, defendants argue, is the only way to ascertain the *bona fides* of a person's identification with a given community. Mr. Wallace testified that a fixed residence:

... places a voter in a given location ... The significance of that, of course, is, for voting purposes, an interest in the election. Most of our elections are under the representative form of government, from the committeemen ... up through the legislature through Congress whereby a given representative represents the people residing in that particular locality. He takes care of those. So therefore, you are giving the persons the right to vote for that person who will represent them.[17]

In order to assure this connection to the community, Mr. Wallace testified that a fixed location is imperative if criminal sanctions for violations of the Election Law are to be effective. Mr. Wallace asserted that in the case of the homeless, such sanctions would be meaningless because the law defines residence in terms of a place to which one intends to return. He explained that a homeless person may claim a park bench as his voting residence but may not have visited it for several years. If such person claimed an intent to return to that bench,

---

13. Tr. 83.

14. Tr. 94.

15. Tr. 95–96.

16. In *Dunn v. Blumstein, supra,* the Court pointed out:

We have in the past noted approvingly that the States have the power to require that voters be *bona fide* residents of the relevant

political subdivision ... An appropriately defined and uniformly applied requirement of *bona fide* residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny.

405 U.S. at 343–344, 92 S.Ct. at 1004 (citations and footnotes omitted).

17. Tr. 194–195.

Mr. Wallace questioned, how could that possibly be disproved? [18]

Plaintiffs called Curtis B. Gans, as an expert witness [19] on voting practices. Mr. Gans discussed the plans now in place in Washington, D.C. and Philadelphia, Pennsylvania which permit the homeless to vote. He explained that the Washington plan permits the homeless person to use as his voting address the place where he sleeps, whether it is a park bench or any other non-traditional accommodation. The Philadelphia plan requires that a homeless person designate a particular shelter, regardless of where he sleeps, as a voting address. Thus, under the Washington plan the location of the park bench would designate the election district, while under the Philadelphia plan the location of the shelter would designate the election district. Mr. Gans testified that he preferred the Philadelphia plan because it also provides for a mail check at the shelter.

Mr. Gans further testified that, in his opinion, a variant of the Philadelphia plan could be adopted in New York [20] by having the homeless person designate a shelter (in which he would not be required to live) for receipt of mail and voting. He explained that these requirements would provide a verifiable nexus for the homeless person to a given locale. The witness also explained that he believed a system which permitted a homeless person to designate his non-traditional home (park bench) and provide a mailing address would be administratively feasible. Under such a plan, the concern of the defendants, that a voter have a tie to the community, would be met.[21]

This Court finds that Mr. Gans' testimony was responsive to the central concern raised by Mr. Wallace, *viz* how could a homeless person's "residence" be disproved if it were based solely upon his intent to make a particular place his home? Mr. Gans further explained that he would not demand any specialized interest of the voter in the community as a predicate to the exercise of the franchise. His concern is rather that a citizen who has an inherent right to vote do so. Mr. Gans observed, that even in the area of election law, the presumption is that people will not commit fraud. He testified:

What I am suggesting is that the state has an interest in seeing to it that the voting population of the community is identified and stabilized and there cannot be late, last minute influxes of transients and people.

In order to do that, my sense was that the Philadelphia plan, by establishing a locus within each [election district] or ward or whatever, by which the homeless could register, serves as a protection for those people who want to achieve a stabilized voting list and a voting list whose integrity is preserved.[22]

Mr. Hopper also endorsed the proposal that a homeless person designate both his non-traditional residence and a place for the receipt of non-forwardable mail. This Mr. Hopper believed was a satisfactory indicia of connection with a particular community. He testified, that the experience of outreach teams, and his own experience as a researcher had demonstrated that homeless persons "can be found once you know the territory in which they live...." [23]

---

**18.** Mr. Wallace distinguished the homeless from those with multiple homes by explaining that a person may have more than one home but only one voting domicile which is readily ascertainable by checking, the time spent in a particular location, utility bills, etc.

**19.** Mr. Gans is Vice President and Executive Director of the Committee for the Study of the American Electorate with offices in Washington, D.C. The Committee is a non-partisan, non-profit, tax exempt research corporation concerned with voter participation in elections.

**20.** Tr. 28.

**21.** Tr. 33–34, 42, Mr. Gans also recommended as an alternative means of voter registration the issuance of voter identification cards containing the voter's picture and residence. Tr. 41.

**22.** Tr. 47.

**23.** Tr. 98.

## C. Voter Fraud

Witnesses Paul Asofsky,[24] Wallace, Hopper and Gans each addressed the issue of fraud in the election process. Each of them agreed that the status of homelessness raised no presumption that homeless persons are more prone to commit voter fraud than any other group or class. Clearly then, the disenfranchisement of the homeless must be justified on some other ground.

Defendants' expert Asofsky testified that if the homeless were permitted to vote, the door would be open to the possibility that unscrupulous persons might attempt to register ficticious voters whose identities could not be verified. He used as an example the Presentment of the Kings County Grand Jury [25] in which the Grand Jury found multiple abuses and fraudulent practices in primary elections in Kings County from 1968 to 1982.

The Court notes that in the State of New York, candidates for public office from the same party, compete for the party nomination by circulating nominating petitions in the locality they wish to represent. These petitions may only be signed by duly qualified voters of the party who are registered in the area. Candidates who receive the required number of valid signatures are placed on the party ballot and voters then select the party nominee at a primary election. Every candidate for elective office is well aware that his or her petition may be subject to challenge. It is therefore in the candidate's interest, to obtain signatures from voters who are readily available to testify in support of the petition.

It is unlikely that any candidate would seek the signature of a homeless voter who may not be at his park bench when the process server pays a call. The risk of a possible court challenge mandates caution in the solicitation of signatures. In any event, the failure of the homeless person to be immediately available to testify in court in support of a candidate's position does not constitutionally justify disenfranchisement of the homeless voter. Further, the Kings County Grand Jury Presentment did not deal in any manner with the homeless but instead dealt with presently qualified voters.

## D. Administrative Feasibility

Mrs. Dolen testified, that in her opinion it would not be administratively feasible to permit registration for the homeless. She cited New York Election Law 4–100(1) which provides:

> The State of New York shall be divided into election districts which shall be the basic political subdivision for purposes of registration and voting as provided in this chapter.

Mrs. Dolen explained that the City Board of Elections uses maps which divide the county of New York into assembly districts ("A.D.") drawn by the State Legislature. Within the assembly districts, Mrs. Dolen and her employees enter the addresses of all buildings in the confines thereof and then subdivides the assembly districts into election districts ("E.D.") with roughly equivalent populations.

When a person registers to vote and gives his residential address,[26] the Board designates from its maps the election district in which the given building is located. The Board then sends the voter, by nonforwardable first class mail, an identification

---

**24.** Mr. Asofsky is a tax lawyer who has been actively engaged for sixteen years in cases involving election law matters. For ten years he served as the co-chairman of the election law committee of the New Democratic Coalition. Mr. Asofsky has been an Adjunct Professor at the Cardozo Law School at which he taught a course in election law.

**25.** *In the Matter of Confidential Investigation,* No. R84–11 (Sup.Ct., Kings County).

**26.** The new registrant fills out a voter registration card (commonly referred to as a "buff card"). The front of the card contains spaces for the voter's name, address, physical description, voting history, citizenship party enrollment and a space for entry of the registrant's election and assembly district. In addition, the card contains an affirmation, which the applicant signs under penalty of perjury, that the information is true.

card notifying the voter of the polling place from which he or she may vote.

Mrs. Dolen testified that since parks have no building numbers, there is no presently existing way to identify the election district for a park resident. Mrs. Dolen further testified that she did not know whether it would be practical or feasible to incorporate homeless persons in this scheme, but she would be willing to try.[27]

This Court has examined the maps for New York County and observes that each park, and other places where the homeless congregate, with a few exceptions like Central Park and Riverside Park, are contained within their own election district. For example:

| Place | Election District | Assembly District |
| --- | --- | --- |
| St. Gabriels Park | 61 | 63 |
| Washington Square Park | 27 | 61 |
| Columbus Park | 70 | 61 |
| Battery Park | 83 | 61 |
| City Hall Park | 1 | 61 |
| Union Bus Terminal/ Port Authority Bus Terminal | 7 | 64 |
| Pennsylvania Station/ Madison Square Garden | 2 | 64 |
| Union Square Park | 34 | 64 |
| Madison Square Park | 35 | 64 |
| Bryant Park | 30 | 64 |
| Morningside Park | 14 | 69 |
| Fort Tryon Park | 44 | 72 |
| Baker Field | 60 | 72 |

The few parks which are not within a single election district have easily determinable lines drawn along streets. For example, Central Park above the 96th Street crosstown is the 81st E.D. of the 68th A.D.; between the 96th Street crosstown and the 86th Street crosstown it is the 87th E.D. of the 69th A.D. Therefore, the homeless person would need only know between which two crosstown streets he lived.

While it is true that Riverside Park, for example, includes several E.D.'s of several A.D.'s, these E.D.'s may also be delineated by streets. Moreover, the City Board could, if it chooses to, make Riverside Park into one E.D. for each part of the park within an A.D.

This Court believes that the difficulty expressed at trial, namely having a voter specifically designate his park bench by meets and bounds, with reference to another fixed location, is a non-issue. If, as plaintiff Dyer claims, he lives in St. Gabriels Park, that park is located entirely within the 61st. E.D. of the 63rd A.D. Therefore it would be unnecessary to either change the election maps in order to place location numbers on park benches or make any other costly alteration to present administrative procedures.

In addition to designating a park as the place of residence, credible witnesses have testified that the homeless applicant could, in addition, designate a post office box, shelter or other co-operating local organization as the place to which he could receive non-forwardable mail. At trial Mr. Wallace expressed his concern that a shelter or organization recipient of non-forwardable election mail is presently under no duty to return such undelivered mail to the Board of Elections. In response to this concern this Court suggests for example, that it is feasible to enter into binding agreements with such organizations for that specific purpose.[28]

Defendants have already stipulated that homeless persons residing in shelters or hotels, which by definition are temporary accommodations, may be allowed to vote. There is presently an inadequate number of shelters to house the plaintiff class, therefore, other solutions must be considered in the search for less onerous alternatives to disenfranchisement of this class. That such alternatives are available is evidenced by the plans adopted in Philadelphia and Washington, and by the testimony at trial.

■ This Court is of the opinion that the administration of the election laws should

---

**27.** Tr. 157.

**28.** The Board of Elections pursuant to Election Law 3–300 has the authority to appoint clerks and other employees, prescribe their duties, and fix their titles and salaries.

be left to the discretion of the Executive Branch. However, when that discretion has been exercised so as to disenfranchise homeless voters as a class, and when less onerous alternatives have been shown in this record to be both available and feasible, this Court must find that defendants have not met their burden of justification by a fair preponderance of the credible evidence.

## FINDINGS OF FACT

### JURISDICTION

This Court therefore finds the following:

1. This Court has jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. § 1983 to redress deprivations under color of state law, custom and practice of rights, privileges and immunities reserved to plaintiffs by the Constitution and laws of the United States.

2. Jurisdiction is further conferred on this Court by 28 U.S.C. § 1331, as a civil action arising under the Constitution and laws of the United States.

3. Venue is properly laid in the United States District Court for the Southern District of New York, the district in which plaintiffs' claims arose, as specified in 28 U.S.C. §§ 1391 and 1392.

### PARTIES

4. Plaintiff Peter Dyer [29] is a citizen of the United States and a resident of the City and State of New York over 18 years of age. He is not ineligible to vote because of any felony conviction, nor has he been adjudged incompetent. He has never accepted money to vote or refrain from voting. (Complaint ¶¶ 18, 28; Preliminary Injunction Tr. Dyer 58–59; Memorandum Opinion at 7, 15).

5. Defendant Robert S. Black is sued in his official capacity as President of the New York City Board of Elections. He presides over the Board of Elections of the City of New York, which administers and enforces the New York Election Law and regulates the electoral process in New York City. Specifically, defendant Black has the power and duty to ensure that the rules and regulations implementing the provisions of Election Law §§ 5–102 and 5–104 are enforced, including challenges to and cancellation of voter registration for lack of any statutory qualifications. (Complaint ¶ 20; Preliminary Injunction Tr. 3–4; Black 7–10).

6. Defendant Joyce D. Tannenbaum is sued in her official capacity as Chief Clerk of the Manhattan Borough Office of the New York Board of Elections. As Chief Clerk, Ms. Tannenbaum has authority to deny individual applications for registration as a voter, and did deny the applications of plaintiffs to register, on the ground that plaintiffs lack the requisite "residence" under the New York Election Law. (Complaint ¶ 21; Preliminary Injunction Tr. 4; Tannenbaum 30–36).

7. Defendant Betty Dolen is sued in her official capacity as Executive Director of the New York City Board of Elections. She has publicly stated that the New York Election Law does not permit homeless persons to register to vote, and that the New York City Board of Elections will refuse their applications to register. (Complaint ¶ 22; Preliminary Injunction Tr. 4; Tr. Dolen 185; Dolen 25–28, 60–63, 66–67, 79–81).

8. Defendant George D. Salerno is sued in his official capacity as the Chairman of the New York State Board of Elections, which gives advisory opinions to local Boards, administers and enforces the New

---

**29.** At the hearing on the preliminary injunction, counsel for plaintiffs and defendants stipulated on the record, and the court entered judgment thereon that all homeless individuals in New York who reside in shelters and hotels, such as plaintiffs Pitts and Carter, may register to vote provided that they otherwise satisfy the requirements of eligibility under the New York Election Law. This lawsuit therefore continues sole-

ly with respect to homeless persons such as plaintiffs Dyer and Hines who live in the street and other public places (Memorandum Opinion at 2). A Motion for a Stay and Severance as to Plaintiff Ruben Hines has been "So Ordered" this day. Accordingly, these findings of fact will only address the facts as they pertain to Mr. Dyer.

York Election Law. Mr. Salerno, as Chairman of the Board, is responsible for the administration of the New York Election Law and for the issuance and enforcement of rules and regulations which regulate the electoral process in the State of New York. Specifically, the Chairman has the power and the duty to ensure that the laws implementing Election Law §§ 5–102 and 5–104 are enforced. (Complaint ¶ 23; Preliminary Injunction Tr. 4; Salerno 9–11).

## BACKGROUND OF THE CASE

9. For reasons that are self-evident, it is almost impossible to make an accurate count of the number of homeless persons living in the State of New York. According to the needs assessment of the New York State Department of Social Services, the number of homeless persons living in New York State is estimated to be between 40,000 and 50,000. It is believed that at least 38,000 of those live in New York City (Tr. Hopper 77–78). The number of homeless in New York City who pass through public shelters and/or hotels for the homeless each year is estimated to be 60,000 by Governor Mario Cuomo. M. Cuomo, *A Report to the National Governors' Association Task Force on the Homeless* 16 (1983).

10. There are 18 public shelters in New York City which, on any given night, can accommodate approximately 5,500 men and 840 women. In addition, private shelters in New York City provide approximately 1,000 beds (Tr. Hopper 92, 94, 109–10).

In addition to those homeless who regularly stay in shelters which are almost nightly filled to or beyond capacity, there are the uncounted homeless who do not make regular use of shelters, but who live in public places like streets, public parks and transportation terminals. According to plaintiffs' expert, the number of such homeless persons is estimated to be 20,000 in New York City. (Tr. Hopper 81–82).

12. According to plaintiffs' expert, there are approximately 100 soup kitchens in New York City which provide meals for the homeless. In addition, there are drop-in centers and outreach teams which provide services for and have regular contact with many homeless persons and who tend to know with some degree of precision and reliability those homeless persons they see on a regular basis and where they can be found. These institutions also provide sleeping space for the homeless in such facilities as church basements (Tr. Hopper 96–97).

13. Many homeless persons can and do receive mail at the residences of family or friends, at post office boxes, through General Delivery, or at shelters, soup kitchens, drop-in centers or churches providing services to the homeless. (Tr. Hopper 90).

14. Like any cross-section of the community, the homeless population is made up of persons of varying backgrounds, styles and personalities. Nevertheless, plaintiff Dyer's experience and lifestyle are typical of many homeless persons who do not reside in shelters. In fact, this Court has found that he is a fair and adequate representative of the class of homeless persons living in public places or other locations not traditionally considered a "home".[30] (Tr. Hopper 88–89; Tr. 117.)

15. Outreach teams and the experience of expert researchers indicate that a great many homeless persons can be located with regularity because safe haven, once found, is unlikely to be abandoned, and once a homeless person becomes familiar with the services providing food, clothing and other necessities, in a given territory, he or she tends to make use of them rather than move on and find new sources from night to night (Tr. Hopper 89).

16. For ten years, Mr. Dyer worked for the American Indian Community House in various capacities, most recently as Special Projects Coordinator. In 1981, he lost that job because of program funding cuts and in August 1981 he was forced to leave his apartment because he could no longer af-

---

**30.** This Court issued an opinion and order dated October 5, 1984 certifying plaintiff's class and the named plaintiff, Dyer, as an adequate class representative.

ford to pay the rent (Complaint ¶¶ 28–29; Memorandum Order at 3).

17. Mr. Dyer is a homeless New Yorker. During the past year, Mr. Dyer has lived in St. Gabriels Park on 35th Street and First Avenue in New York City. He considers St. Gabriels Park his home, *i.e.*, the place where he generally intends to return. Except for occasional overnight stays in shelters, at a friend's house, in other parks, or locations out of the rain in midtown Manhattan, and use of Grand Central Terminal for shelter in winter months, he regularly sleeps in St. Gabriels Park (Preliminary Injunction Tr. Dyer 52; Memorandum Opinion at 7, 15).

18. Mr. Dyer has arranged to have mail delivered to him at a friend's apartment and at the Coalition for the Homeless. (Preliminary Injunction Tr. Dyer 52–5; Tr. Dyer 59–60).

19. In February 1984 and June 1984, Mr. Dyer applied to the New York City Board of Elections to register to vote. (Complaint ¶–29; Preliminary Injunction Tr. Dyer 53–58; Memorandum Opinion at 7).

20. Mr. Dyer's applications to vote were rejected by the New York City Board of Elections. (Complaint ¶ 29; Preliminary Injunction Tr. Dyer 53–58; Memorandum Opinion at 7).

21. Defendants refused to permit Mr. Dyer to register to vote based solely on the fact that he is homeless. (Memorandum Opinion at 7, 15; Black 30–31; Tannenbaum 14, 16–17, Pl. Ex. 5; Tr. Dolen 185).

22. The policy and practice of the New York City Board of Elections is to reject the registration applications of all homeless New Yorkers on the ground that they do not have a residence and are therefore not entitled to vote. (Preliminary Injunction Tr. 28–29; Tannenbaum 14, 16–17; Pl. Ex. 13).

23. The policy of the New York State Board of Elections is that homeless New Yorkers do not have a residence and are therefore not qualified to vote. (Prelimi-

nary Injunction Tr. 28–29; Tr. Salerno 29, 34–35, 57–59; Pl. Ex. 13).

24. The defendants maintain that they have adopted the position that the homeless are not allowed to vote to protect against voter fraud. While it cannot be disputed that the prevention of voter fraud is a compelling and legitimate State goal, procedures designated to eliminate voter fraud are already in existence and less restrictive alternatives to the total disenfranchisement of the homeless are available.

## PROCEDURES DESIGNATED TO PROTECT AGAINST VOTER FRAUD

25. The procedures governing the New York registration and voting process already provide significant measures to safeguard against voter fraud. (Tr. Dolen 179–81, 183–85; Tannenbaum 17–29; Salerno 40–48; Wallace 27–30; Dolen 29–30, 47–53, 83–84; *See, e.g.,* N.Y.Elec.Law § 3–107 (conferring on the State Board of Elections powers and duties with respect to crimes against the elective franchise, including the power to procure warrants of arrest and to issue subpoenas); § 3–218 (conferring on the City and County Boards of Elections the power to issue subpoenas and hold hearings relating to violations of the elective franchise); § 5–400 (providing for the cancellation of voter registration for lack of any statutory qualifications); §§ 5–700, 5–702, 5–704, 5–708, 5–710 and 5–712 (providing for checks on registration and continued eligibility for registration); §§ 8–502 and 8–504 (providing procedures for challenging the right to vote of any person whom the Board knows *or suspects* is not entitled to vote); § 5–106(1) (excluding from qualification to vote any person who has received, accepted or offered any money or other compensation for voting or registering to vote or refraining from either); §§ 17–100 to –170 (relating to violations of the elective franchise and providing, in §§ 17–104 and 17–132, that false registration and illegal voting are felonies).

26. One method used by the New York City Board of Elections to eliminate possible voter fraud is a procedure commonly

referred to as a mail check. Each summer, the Board of Elections sends a non-for-wardable notice to each registered voter. If the notice is returned to the Board of Elections because the registrant has moved from that address, the registrant's name is eliminated from the list of registered voters, subject to reinstatement upon satisfactory proof of residence being presented to the Board. (N.Y.Elec.Law § 5–712; Tr. Dolen 170–73; Tannenbaum 18–19, 28–29; Salerno 40; Dolen 50–52.)

27. Another method used by the New York City Board of Elections to eliminate possible voter fraud is a signature verification procedure used at the time of voting. At the polling place, the voting inspector has custody of the voter's registration card which was signed by the voter at the time of registration. Prior to voting, the voter once again signs this card and the inspector compares the two signatures. If the signatures do not match, the inspector can challenge the identity of the voter, subject to reinstatement upon satisfactory proof of identity being presented to the Board. (Tr. Dolen 179–80; Tannenbaum 24–25; Salerno 45–47; Dolen 47–49, 50).

28. A third procedure available to the Board of Elections is a physical search for the registrant to ensure that he or she resides at the residence indicated on the registration application. This procedure is rarely used. In the experience of the City's Chief Clerk, it has been used only twice in the last two years or so. It is not a significant method of preventing voter fraud. (Tr. Dolen 184–85; Tannenbaum 19–20; 1 46).

29. The wide availability of criminal sanctions, both on the State and Federal level, also assist the Board of Elections in preventing and eliminating voter fraud. (Dolen Tr. 180); Tr. Gans 29–30; Dolen 29–30, 53, 83–84; Salerno 46). In addition, the New York registration application form has the force of an affidavit. (Tr. Dolen 180).

30. It is important to note that, despite the procedures designed to prevent voter fraud, personal integrity and honesty are the foundation of the electoral process (Tr. Gans 20). Other than the procedures outlined above, the registration and voting process in New York requires no proof of eligibility for registration other than the registrant's own word as to his identity, his age, his citizenship and his residence. (Tannenbaum at 18–19; Salerno at 45–48). This data is taken without verification from those who claim a traditional home and the potential for voter fraud is the same for them as it is for the homeless. (Salerno at 46–48; Tr. Gans 31).

### LESS RESTRICTIVE ALTERNATIVES

31. No proof (other than speculation) was adduced before the Court that the homeless are more likely to commit fraud than other individuals. (Tr. Gans 31). Indeed, defendants' proof of instances of voter fraud pointedly did *not* involve the homeless or misuse of residence, but rather use of fictitious names at real residences. (Tr. Asofsky 125–26, 145).

32. One of the purposes of the New York Election Law, and a duty imposed on the defendants, is to encourage the widest possible voter registration (Tr. Wallace 209; N.Y.Election Law 5–200(1), (3)).

33. Alternatives exist that are less restrictive than defendants' current policy of total disenfranchisement of the homeless.

34. The District of Columbia Board of Elections and Ethics recently decided to permit registration by homeless persons who can identify a specific location in the District at which they have a present intention to remain. (Pl. Ex. 2 at 6). The Board found that the same controls applicable to all registrants can be applied to homeless applicants and that challenges to eligibility on such matters as whether they continue to be located at their designated places and criminal sanctions for fraud are part of the statutory framework. (Pl. Ex. 1 at 2). The D.C. Board adopted regulations amending the D.C.Code to permit homeless persons to register by specifying (1) a fixed residence location in the District, precisely identified, and (2) if mail is not deliverable to such

residence address, a designated mailing address. Under these regulations, failure to provide such designated mailing address results in the rejection of the registration application by the Board. Any applicant designating a mailing address for official communications is required to submit a signed statement, on a form provided by the Board, specifying that the registration address listed on the application constitutes the voter's fixed residence in the District. (Pl. Ex. 3; Tr. Gans 19–21). In addition, the D.C. Board has instituted an annual canvass of all registered voters in the District during which the Board will mail a nonforwardable notification to the voter's registration address and, in any instance where this notification is returned by the U.S. Postal Service, the Board will initiate removal procedures pursuant to the D.C. Code § 1–1311(f)(3). (Pl. Ex. 3).

35. On September 14, 1984, an order was entered in *Committee for the Dignity and Fairness for the Homeless v. Tartaglione*, No. 84–3447 (E.D.Pa. September 14, 1984) (Lord, J.), to the effect that for purposes of voter registration in the City of Philadelphia, any applicant who is homeless shall be deemed to have satisfied the residency requirements set forth in the Pennsylvania Election Code, 25 P.S. §§ 623–1 *et seq.*, as amended, by declaring on the Voter Registration Application the address of a shelter with which the applicant has an established relationship, and which will accept first-class non-forwardable mail for the applicant. Under the Philadelphia decree, only public and private non-profit shelters which operate residential programs for the homeless, accept first-class non-forwardable mail for the homeless and agree that homeless individuals may establish sufficient relationships with those shelters qualify as residential addresses. The court in *Tartaglione* further ordered that the authority of the City Commissioners under the Pennsylvania Election Code to conduct investigations or other inquiries into the continuing eligibility of all registered electors within the City was in no way limited by the court order. (Pl. Ex. 4; Tr. Gans 21–23).

36. While defendants testified to theoretical problems raised by permitting the homeless to register to vote, these problems are at best administrative (Tr. Dolen 158–59, Wallace 195–200, 211). They conceded that there is no principled reason why New York cannot have plans similar to Washington's or Philadelphia's. (Salerno Tr. 77–78; Tr. Wallace 210–12).

II.

CONCLUSIONS OF LAW

Based on the foregoing findings of fact, this Court makes the following conclusions of law.

1. Plaintiffs are entitled to a Declaratory Judgment declaring that defendants' application of New York Election Law Sections 1–104(22), 5–102 and 5–104, to the extent that this application effectively disenfranchises homeless individuals, violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983; and are further entitled to a permanent injunction enjoining defendants from refusing to allow homeless individuals to vote, solely on the ground that the residency requirement of the New York Election Law cannot be met by those who inhabit a non-traditional residence.

2. The exercise of the right to vote is a fundamental right, which is preservative of all other rights in a democracy, and deserves the strictest constitutional protection. *See Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964); *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886).

3. Each citizen has "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction". *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972) (citing *Evans v. Cornman*, 398 U.S. 419, 421–22, 426, 90 S.Ct. 1752, 1754–55, 1756, 26 L.Ed.2d 370 (1970); *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 626, 89 S.Ct. 1886, 1889,

23 L.Ed.2d 583 (1969); *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665, 86 S.Ct. 1079, 1080, 16 L.Ed.2d 169 (1966); *Carrington v. Rash*, 380 U.S. 89, 93–94, 85 S.Ct. 775, 778–779, 13 L.Ed.2d 675 (1965); *Reynolds v. Sims*, 377 U.S. at 562, 84 S.Ct. at 1381.

4. State statutes, such as New York Election Law §§ 5–102, 1–104(11) and 5–104, as applied by defendants, which effectively disenfranchise one class of voters, while granting the right to vote to another class of voters, are constitutionally invalid as applied, unless the exclusions are *"necessary* to promote a *compelling* state interest". *Kramer v. Union Free School District No. 15*, 395 U.S. at 627, 89 S.Ct. at 1890 (emphasis added). *See also Manhattan State Citizens' Group, Inc. v. Bass*, 524 F.Supp. 1270 at 1274 (D.C.N.Y.1981).

■ 5. Where a compelling interest exists, statutory restrictions on voting must be narrowly tailored to the articulated State interest and the State must show that the interest cannot be served by a means less restrictive of the right to vote. *See Dunn v. Blumstein*, 405 U.S. at 350–54, 92 S.Ct. at 1007–09; *Kramer v. Union Free School District No. 15*, 395 U.S. at 632–33, 89 S.Ct. at 1892–93; *Carrington v. Rash*, 380 U.S. at 95, 85 S.Ct. at 779; *Alevy v. Downstate Medical Center*, 39 N.Y.2d 326, 332, 384 N.Y.S.2d 82, 87, 348 N.E.2d 537, 543 (1976).[31]

6. The statewide disenfranchisement of homeless individuals is not necessary to promote any compelling state interest, and defendants' interpretation and application of the New York Election Law residency requirement is unjustified.

7. Defendants have failed to establish that the significant state interests underlying voter residency requirements, which include (1) prevention of voter fraud and protection of the integrity of the electoral system, *see Dunn v. Blumstein*, 405 U.S. at 345, 92 S.Ct. at 1004; *Auerbach v. Kinley*, 499 F.Supp. 1329, 1337, 1342 (N.D.N.Y. 1980); (2) identifying an electorate that has a stake in the community; *see Evans v. Cornman*, 398 U.S. at 422, 90 S.Ct. at 1754; *Kramer v. Union Free School District No. 15*, 395 U.S. at 631, 89 S.Ct. at 1891; and (3) administrative workability, *see In re Applications for Voter Registration of Willie R. Jenkins*, Decision at 3 (D.C. Board of Elections and Ethics, June 7, 1984) (Pl. Ex. 4), cannot be achieved by a means restrictive of plaintiffs' right to vote.

8. At least two other jurisdictions have devised alternative residency requirement procedures which are less restrictive of voting rights than the procedure utilized in New York. *See* Pl. Ex. 1, 2 and 4.

■ 9. In determining whether an individual has a "residence" the key objective is to ascertain "the place which is the center of an individual's life, ... the locus of his primary concern", *Ramey v. Rockefeller*, 348 F.Supp. 780, 788 (E.D.N.Y.1972), and the place the individual presently intends to remain. *Martinez v. Bynum*, 461 U.S. 321, 103 S.Ct. 1838, 1844 n. 13, 75 L.Ed.2d 879 (1983). These factors are not unlike those required to establish "domicile" in other legal contexts. *See*, e.g., *Martinez v. Bynum*, 461 U.S. at 331, 103

---

**31.** This Court notes that Municipal defendants' reliance in their Trial Memorandum of Law on *New York City Unemployment and Welfare Council v. Brezenoff*, 742 F.2d 718 (2d Cir.1984) is totally misplaced. The issue in *Brezenoff* was whether the First Amendment guarantees an organization of welfare recipients the right to solicit contributions in lobbies of welfare offices. In affirming the trial court's ban on solicitations, the Second Circuit considered "whether the solicitation prohibition is no broader than necessary to serve the HRA's interest, and whether its implementation would leave open adequate alternative channels of communication." *Id.* at 721. Noting that the government may impose reasonable time, place or manner restrictions, the Court found that "there are ample *alternative* forums for the Council to solicit dues," including on the sidewalks outside of the welfare agencies. *Id.* at 723 (emphasis added). Thus, the restrictions at issue in *Brezenoff* stands in stark contrast to the total disenfranchisement in the instant case of all homeless New Yorkers who do not live in shelters or welfare hotels.

S.Ct. at 1844; *Vlandis v. Kline,* 412 U.S. 441, 454, 93 S.Ct. 2230, 2237, 37 L.Ed.2d 63 (1973). The test for domicile is generally more stringent than the test for mere residence, since a person may have several residences but can only have one domicile. *See In re Woolley,* 108 N.Y.S.2d 165, 168 (Sup.Ct. Lewis County 1951). *Berman v. Weinstein,* 64 A.D.2d 940, 941, 408 N.Y. S.2d 143, 144 (2d Dep't 1978).

10. Homeless individuals identifying a specific location within a political community which they consider their "home base", to which they return regularly, manifest an intent to remain for the present, and a place from which they can receive messages and be contacted, satisfy the more stringent domicile standard and should not be disenfranchised solely because they lack a non-traditional residence.

## CONCLUSION

For the foregoing reasons, this Court enters a judgment declaring defendants' application of New York Election Law Section 1–104(22), and 5–102 and 5–104 in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983; permanently enjoining defendants from refusing to allow homeless individuals to register to vote on the ground that they fail to inhabit traditional residences.

It Is So Ordered.