306 F.3d 1256
 Harold M. WIT and Donald C. Ebel, Plaintiffs-Appellants,
v.
Carol BERMAN, Chairperson of the New York State Board of Elections, Weyman A. Carey, President of the New York City Board of Elections, Rosanna Rahmouni, Chief Clerk of the Manhattan Borough Office of the New York City Board of Elections, and Eliot Spitzer, Attorney General of the State of New York, Defendants-Appellees.
 Docket No. 00-9482.
 United States Court of Appeals, Second Circuit.
 Argued: August 28, 2001.
 Decided: October 11, 2002.
 
 Richard A. Briffault, Columbia Law School, New York, N.Y. (Michael B. Gerrard, Craig A. Stewart, Emma K. Lewis, Kerry A. Dziubek, Arnold & Porter, New York, NY, of counsel; Gerald E. Frug, Harvard Law School, Cambridge, MA, of counsel), for Plaintiffs-Appellants.
 Melanie L. Oxhorn, New York State Office of the Attorney General, New York, NY, Todd D. Valentine, New York State Board of Elections, Albany, N.Y. (Eliot Spitzer, Attorney General of the State of New York, New York, NY, of counsel; Michael D. Hess, Corporation Counsel, City of New York, New York, NY, of counsel), for Defendants-Appellees.
 Patricia C. Kakalec (Daniel Werner, of counsel), Farmworker Legal Services of New York, Inc., New Paltz, NY, for Amicus Curiae Farmworker Legal Services of New York, Inc.
 Before MESKILL, WINTER, and STRAUB, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 Harold M. Wit and Donald C. Ebel appeal from the dismissal of their complaint by Judge Hellerstein for failure to state a claim. See Fed.R.Civ.P. 12(b)(6). The complaint alleged a violation of appellants' rights to equal protection of the laws under the federal and state constitutions. We affirm, holding that the New York State Election Law ("Election Law") does not impermissibly deny citizens who have homes in multiple communities the right to vote in multiple local elections.
 
 BACKGROUND
 
 2
 Each appellant has maintained a home in New York City for over forty years. Each pays income and property taxes in the City, owns real property there, is listed in the New York City telephone directory, uses his New York City residence for personal financial statements, and spends a considerable portion of every year living there. In addition, each appellant meets other qualifications — age and citizenship — to register to vote in New York City.
 
 
 3
 Appellants were once registered to vote in New York City and voted there. However, for some years, both have also lived, and have been registered voters in, the towns of East Hampton and Southampton, respectively. Appellants are currently barred from voting in New York City because they are also registered to vote in the Hamptons. Each alleges that, if they were not registered to vote in the Hamptons, they would be allowed to register in New York City.
 
 
 4
 Under New York law, one must be a resident of an electoral district to register as a voter in that district. "Residence" is defined in the Election Law as "that place where a person maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return." N.Y. Elec. Law § 1-104(22) (emphasis added). Section 17-104 of the Election Law provides that any person who "[r]egisters or attempts to register as an elector in more than one election district for the same election" is guilty of a felony. N.Y. Elec. Law § 17-104(2), (5). Other sections of the Election Law also impose felony penalties on those who knowingly attempt to register "when not qualified" and on those who attempt to vote in an election "more than once." N.Y. Elec. Law § 17-132(1), (3), (9).
 
 
 5
 In June 2000, appellants filed the present complaint challenging the constitutionality of the pertinent provisions of the Election Law and seeking declaratory and injunctive relief permitting them to register to vote in local elections in New York City while maintaining the right to vote in the Hamptons. The complaint claims that the Election Law, as written and enforced, violates the Equal Protection Clause because it denies appellants the right to register to vote in elections in New York City even though, save for New York defining residency for voting purposes as the location of one's single permanent home — "that place" — they possess the same indicia of residency as those residents of New York City who are deemed qualified to register to vote. The complaint also asserts that the Election Law infringes on appellants' federal constitutional rights to due process of law and intrastate travel as well as their rights under various provisions of the New York Constitution.
 
 
 6
 In July 2000, appellees moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). After oral argument, the district court granted the motion to dismiss. On appeal, appellants renew their federal equal protection claim.[1]
 
 DISCUSSION
 
 7
 We review a dismissal under Rule 12(b)(6) de novo, with all inferences drawn in favor of the nonmoving party. Moore v. PaineWebber, Inc., 189 F.3d 165, 169 (2d Cir.1999).
 
 
 8
 Where a statute invidiously discriminates in granting the right to vote, we apply strict scrutiny in our review. See Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 626-28, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). However, although voting is of the most fundamental significance under our constitutional structure... [i]t does not follow ... that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (citation omitted). As the Court elaborated in Burdick:
 
 
 9
 Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends." Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently.
 
 
 10
 Id. (citation omitted) (quoting Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)). The Burdick Court went on to state that where voting rights are subjected to "severe" restrictions, regulations must be "narrowly drawn to advance a state interest of compelling importance," id. at 434, 112 S.Ct. 2059 (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)), but that where a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. Id. (quoting Anderson, 460 U.S. at 788, 103 S.Ct. 1564). For reasons discussed infra, we uphold the provisions of the Election Law challenged by appellants because those provisions impose only "reasonable, nondiscriminatory restrictions" and advance important state regulatory interests.
 
 
 11
 An Equal Protection claim must be based on impermissible differential treatment. Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir.2001). The differential treatment alleged here is that, because appellants are otherwise qualified under New York law to register in both New York City and the Hamptons, the provision of the Election Law prohibiting them from registering in two places treats them differently than the qualified voters in the election district in which they are not registered. To put it another way, appellants are not allowed to vote in New York City solely because they are registered in the Hamptons. Were they to give up their registration in the Hamptons, they could register in New York City. Therefore, they argue, they are being treated differently than others qualified to vote in the City. Because there is in their view no permissible governmental interest justifying this differential treatment, they conclude that they have been denied their rights under the Equal Protection Clause. We disagree.
 
 
 12
 The Election Law states that no person may vote unless a "resident" of the particular election district. N.Y. Elec. Law § 5-102(1). Residence and the legal concept of domicile are synonymous under the Election Law. See Hosley v. Curry, 85 N.Y.2d 447, 451, 626 N.Y.S.2d 32, 649 N.E.2d 1176 (1995) (stating that the terms "resident" and "inhabitant" are "properly understood to be synonymous with domicile") (citing Palla v. Suffolk County Bd. of Elections, 31 N.Y.2d 36, 47, 334 N.Y.S.2d 860, 286 N.E.2d 247 (1972))); Auerbach v. Rettaliata, 765 F.2d 350, 351 (2d Cir.1985) (stating that under New York law the definition of "residence" for voting purposes is "intended to approximate the test for domicile"); see also McGrath v. Kristensen, 340 U.S. 162, 175, 71 S.Ct. 224, 95 L.Ed. 173 (1950) ("Residence sometimes equals domicile, as in voting"); Restatement (Second) of Conflict of Laws § 11(1) cmt. D (1989) ("Under the local law of many states, the county or other political subdivision where a person is domiciled is the place where ... he may vote....").
 
 
 13
 New York's rule against voting in two election districts reflects a critical aspect of the concept of domicile. The principal usefulness of the concept is that it resolves jurisdictional issues in circumstances in which exclusivity is desirable or necessary, such as probating an estate. Although one may be legally domiciled in different places for different legal purposes, a person is deemed to have only a single domicile for the particular legal purpose for which the concept is then being used. See, e.g., Restatement (Second) of Conflict of Laws § 11(2) (1989) ("Every person has a domicil at all times and, at least for the same purpose, no person has more than one domicil at a time."); California v. Texas, 437 U.S. 601, 611, 98 S.Ct. 3107, 57 L.Ed.2d 464 (1978) (noting, in estate tax context, the general state law principle that "it is possible to have only one domicile"); Rosario v. INS, 962 F.2d 220, 224 (2d Cir.1992) (noting in immigration law context that "a person may have only one domicile"); In re Estate of Newcomb, 192 N.Y. 238, 250, 84 N.E. 950 (1908) (stating that a person may have only one domicile).
 
 
 14
 For purposes of voting in New York, domicile is defined as "that place" where one has the fixed, permanent, and principal home to which, even with extended periods of living elsewhere, one intends to return. N.Y. Elec. Law § 1-104(22) ("The term residence shall be deemed to mean that place where a person maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return."); see also Hosley, 85 N.Y.2d at 451, 626 N.Y.S.2d 32, 649 N.E.2d 1176 ("Mere change of residence although continued for a long time does not effect a change of domicile, while a change of residence even for a short time with the intention in good faith to change the domicile, has that effect." (quoting In re Newcomb's Estate, 192 N.Y. 238, 250, 84 N.E. 950 (1908)). When a person's domicile determines where that person can vote, therefore, it must be a single electoral district.
 
 
 15
 The domicile test for determining where citizens may vote dominates the election laws of most states. See William H. Danne, Jr., Annotation, Residence of Students for Voting Purposes, 44 A.L.R.3d 797 § 2 (1972) (observing that "[i]t is a matter of virtually uniform recognition" that, where state constitutional and statutory provisions limit the right to vote to the residents of a given geographical area, "the term residence should be equated with the concept of domicil"); Restatement (Second) of Conflict of Laws § 11(1) cmt. k (1989) (noting that "residence" is generally interpreted as being the equivalent of "domicil" when used in state statutes relating to voting).
 
 
 16
 The reasons for the reliance upon domicile are quite pertinent to the issue before us. At first blush, it may seem that domicile plays such a key role because it is a close proxy for determining the election district in which a voter has the greatest stake in the outcome of elections. This is an oversimplification, however.
 
 
 17
 Particularly in modern times, domicile is very often a poor proxy for a voter's stake in electoral outcomes because many of an individual voter's varied interests are affected by outcomes in elections in which they do not vote. Some, or even many, voters may reasonably perceive that their primary political concerns are affected more by outcomes in elections in which they do not vote than by outcomes in elections in which they do vote. There are endless examples of the bad fit between domicile and a voter's interest in electoral outcomes. For example, a person who works in a factory, or owns one, located in a municipality other than where the person lives, has interests in that municipality's tax, traffic, law enforcement, and other policies. To take an interstate example, many voters in New England believe that their lives are directly affected by environmental policies in the mid-west industrial states.
 
 
 18
 However, while one may mount ethereal arguments against the single-domicile-registration rule, the administrative problems that interests-based rules would cause for thousands of registrars of voters render those rules virtually unthinkable. Voter registration is generally a nondiscretionary function of local government carried out by low level officials. Absent meaningful guidance, some registrars (even in the same precinct) would use a "whatever-you-say" approach, others will adopt a "show-me-beyond-a-reasonable-doubt" stance, while yet others will resort to ad hoc, ad hominem, or whimsical standards.
 
 
 19
 Given the need for workable standards, determination of where one may vote based on interests in electoral outcomes is not a manageable rule. Honoring the desires of voters to vote in other districts based on their expression of subjective interests in the political decisions of those other districts would essentially lead to a "vote-in-however-many-districts-you-please" rule. Such a rule would be truly chaotic, save for the small measure of order that corruption would bring to it. An objective test of voter interests is equally unworkable. At the very least, it would involve an ever-changing analysis by registrars of the merits of political issues — e.g., does an employee of a firm in one city who lives in another have a sufficient interest in the traffic and tax policies of the former to vote there, or is there sufficiently harmful acid rain in Vermont as a result of loose environmental standards in Ohio to justify a Vermonter voting in Ohio[2] — and would also be chaotic.
 
 
 20
 Domicile as a rule may have its philosophical defects, therefore, but it has enormous practical advantages over the alternatives. It almost always insures that a voter has some stake in the electoral outcome in the domiciliary district and almost always does not involve large numbers of disputes over where one may vote. The domicile rule informs would-be voters where they may vote, a vital function that encourages registration and voting. Moreover, it gives voters the notice required for the enforcement of criminal laws against individuals voting in places where they are not eligible. See N.Y. Elec. Law § 17-132.
 
 
 21
 The New York domicile rule also provides substantially workable standards for registrars of voters as to whether would-be voters are or are not entitled to register. The vast majority of voters have a principal residence in which they have lived for thirty days. Were registrars of voters required to apply a more philosophically satisfying rule with multiple individual voting districts based on concepts such as a voter's stake in the outcome or simply the frequent presence of a voter in the district, each election would have the potential for massive disputes over registration and the legitimacy of election results. Legal bright lines will always be under- or over-inclusive, but chaos is hardly preferable.
 
 
 22
 To be sure, domicile as a test entails administrative difficulties at the margins. The domicile of students is an example. See, e.g., Auerbach, 765 F.2d at 351; Danne, Jr., Residence of Students for Voting Purposes § 2, supra. So too is the registration of the homeless. See, e.g., Pitts v. Black, 608 F.Supp. 696, 709-10 (S.D.N.Y.1984). However, these difficulties are slight compared to those that abandonment of the domicile rule and its one domicile/one electoral district restriction might entail.
 
 
 23
 Appellants are members of a class of persons that gives rise to administrative difficulties under the domicile rule. Their problem is the opposite of the homeless problem — because appellants have multiple homes, there is doubt as to which home is "that place" for domiciliary purposes. New York has responded to this administrative difficulty in a pragmatic way. New York courts have held that, rather than compel persons in appellants' circumstances to establish to the satisfaction of a registrar of voters or a court that one home or the other is their principal, permanent residence, they can choose between them. See People v. O'Hara, 96 N.Y.2d 378, 385, 729 N.Y.S.2d 396, 754 N.E.2d 155 (2001) ("[A]n individual having two residences may choose one to which she has legitimate, significant and continuing attachments as her residence for purposes of the Election Law.'" (quoting Ferguson v. McNab, 60 N.Y.2d 598, 600, 467 N.Y.S.2d 192, 454 N.E.2d 532 (1983)). This pragmatic approach lessens the burdens on registrars, who in most cases need only verify an address, and on people like appellants, who otherwise might be turned down at both places and have to go to court in order to be able to vote anywhere. New York's solution to the multiple home problem is, therefore, quite favorable to appellants and hardly one that can be said to disadvantage them.
 
 
 24
 Moreover, even if appellants were right, the proper remedy for a federal court to order would not be to compel New York to allow appellants to vote in two places. Rather, we would have to order New York to choose between enforcing a strict, single domicile rule, which we believe to be clearly constitutional, see Dunn v. Blumstein, 405 U.S. 330, 343-44, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Evans v. Cornman, 398 U.S. 419, 422, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), or a version of appellants' suggested multiple homes/multiple votes rule.
 
 
 25
 In any event, we see no infirmity in the one-or-the-other rule because a multiple-vote rule would open the door to a host of administrative problems and potential abuses. Abandonment of the one-or-the-other rule in favor of an as yet unarticulated standard that vaguely emphasizes time spent in different communities, including (or not including) a significant number of overnights, would greatly increase the number of persons who might claim the right to vote in multiple elections, while thoroughly obscuring the line between valid and invalid claims. Some people lease or own homes or apartments in particular towns year-round but use them only for a few weeks or months in the summer or winter. Many more may lease a house or apartment for only a particular season. Because of the one-or-the-other rule, such persons do not (or rarely so) seek to vote in such towns. Without such a rule, however, many such persons might claim sufficient residence to justify their voting in multiple places, and registrars of voters would have to adjudicate these claims.
 
 
 26
 In this regard, appellants offer no workable standard to replace a strict domicile test modified by the one-or-the-other rule. Instead of articulating a test or applicable standards, they rest solely on their assertion that their connections with New York City would be sufficient to allow them to vote there were they not registered in the Hamptons, where they have equally sufficient connections. A workable definition of the minimal connections with an election district that are sufficient to trigger a constitutional right to vote in that community as well as elsewhere is not articulated.[3]
 
 
 27
 What is now a minimal problem with the one-or-the-other rule, therefore, could become a major administrative problem without it. The potential difficulties should not be underestimated. Registrars would be called upon to determine, according to criteria not found in appellants' papers, whether a would-be registrant has spent "enough" overnights — or perhaps enough workdays or vacation days — in a district to register. These decisions, moreover, would often have to be made in a very short time frame. Finally, this is no imaginary horrible, because some political organizations might well find it in their interests to attempt to register large numbers of persons with only marginal connections to the electoral district.
 
 
 28
 The need to avoid these problems, which can grow from a tangle to a morass to outright chaos, is probably the reason that domicile remains the dominant American method of determining where persons may vote. New York's granting to persons such as appellants the benefit of the doubt by using a one-or-the-other rule does not undermine the important governmental interests served by the domicile rule and allows appellants to choose freely, rather than compelling them to establish their domicile in only one place. The one-or-the-other rule does not in any sensible use of the word "discriminate" against appellants. Indeed, the Election Law's permissive approach allows appellants to align their strongest, personal political interests with the appropriate voting location. In light of this enhancement of appellants' voting power, the fact that the Election Law does not go further by multiplying appellants' voting power in light of their claimed multiple local interests is not a compelling ground for a claim of discriminatory treatment. Cf. McDonald v. Bd. of Election Comm'rs of Chi., 394 U.S. 802, 811, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (declining to invalidate a remedial election law on the ground that it "has not gone still further," noting that such legislation need not "strike at all evils at the same time").
 
 CONCLUSION
 
 29
 For the reasons stated above, we affirm.
 
 
 
 Notes:
 
 
 [1]
 At oral argument, we called appellants' attention to the fact that appellants' complaint states three claims arising under the New York State Constitution and three claims arising under the federal Constitution. We noted our concern that state constitutional claims might need to be resolved in advance of addressing the federal constitutional claimsSee Massachusetts v. Upton, 466 U.S. 727, 736, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (Stevens, J., concurring in the judgment) (The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or of style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law. (quoting Sterling v. Cupp, 290 Or. 611, 625 P.2d 123, 126 (1981)). Appellants acknowledged that the district court decision disposed of the state constitutional claims and effectively conceded that by limiting their argument on appeal to federal constitutional claims, they were dropping their state constitutional claims. See United States v. Quiroz, 22 F.3d 489, 490 (2d Cir.1994) (per curiam) ("It is well established that `an argument not raised on appeal is deemed abandoned.'") (citing United States v. Babwah, 972 F.2d 30, 34 (2d Cir.1992))); Herrmann v. Moore, 576 F.2d 453, 455 (2d Cir.1978) ("In his brief in this court plaintiff limits the questions presented to his claims under [federal statutes]. We, therefore, rule that he has abandoned any claims which do not involve alleged violations of those statutes.").
 
 
 [2]
 This would be a somewhat unusual, interstate equal protection claim, i.e. Ohio may not allow persons resident there to vote while denying that right to persons from other states who have an equal or greater interest in the electoral outcome. Nevertheless, an interests rule for determining where individuals may vote would seem to support such a claim
 
 
 [3]
 Appellants do not rely upon home ownership in two communities as the decisive fact dividing those who can and cannot vote in two communities, a rule that surely would be challenged by non-homeowners. Rather, they use home ownership as evidence of a connection that, along with substantial time spent in New York City, is sufficient in their view to require that they be allowed to vote in the City as well as in the Hamptons